CITY OF DAVIS, a Municipal Corporation, Plaintiff-Appellant,

v.

William T. COLEMAN, Jr., Secretary of Transportation, et al., Defendants-Appellees.

No. 74-1942.

United States Court of Appeals, Ninth Circuit.

July 30, 1975.

---

David E. Pesonen (argued), San Francisco, Cal., for plaintiff-appellant.

Elias D. Bardis (argued), Dept. of Public Works, Sacramento, Cal., Glen R. Goodsell, Atty. (argued), Dept. of Justice, Washington, D. C., for defendants-appellees.

OPINION

Before DUNIWAY, INGRAHAM,*
and WALLACE, Circuit Judges.

DUNIWAY, Circuit Judge:

This appeal relates to a proposed freeway interchange, the Kidwell Interchange, planned by the Division of Highways of the California Department of Public Works (CDHW) and being built with the help of federal money provided under the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.* The project site is on Interstate Highway 80, between three and four miles south of the plaintiff-appellant City of Davis and roughly the same distance north of the City of Dixon, an intervening defendant-appellee. On October 24, 1972, after work had begun, Davis sought from the district court an injunction against the construction on the grounds that the defendants CDHW and the Federal Highway Administration (FHWA) had failed to hold public hearings as required by 23 U.S.C. § 128

---

* The Honorable Joe McDonald Ingraham, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

and regulations promulgated thereunder (23 C.F.R. Part 790 (1974))[1] and, further, that FHWA and CDHW had failed to prepare and file, respectively, an environmental impact statement (EIS), required by § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), and an environmental impact report (EIR) required by the California Environmental Quality Act of 1970 (CEQA), Cal.Pub.Resources Code § 21100.

Both sides having moved for summary judgment, the district court, in August 1973, held that the defendants had not complied with 23 U.S.C. § 128 but that Davis lacked standing to maintain the claims based upon NEPA and CEQA. Accordingly the court dismissed the NEPA and CEQA claims and entered a preliminary injunction suspending work on the Kidwell Interchange pending satisfaction of the requirements of § 128.

On October 2–3, 1973, two "design public hearings" were held, one in Dixon and one in Davis. CDHW then prepared the required "design study report"[2] (DSR) and forwarded it, together with the public hearing transcript (see 23 U.S.C. § 128(b)), to FHWA with a request for "design approval," which FHWA granted on January 11, 1974. On CDHW's motion, the district court on May 8, 1974, dissolved the preliminary injunction. It is from that order, and

from the earlier ruling on Davis' standing under NEPA and CEQA, that Davis now appeals. We reverse on both points. We also hold that an impact statement fully complying with NEPA and CEQA must be prepared and made available to the public in advance of any new § 128 hearing.[3]

## I. THE FACTS.

### A. The Kidwell Project.

The segment of I–80 on which the Kidwell Interchange is being built traverses from the southwest to the northeast a large tract of producing agricultural acreage (the Kidwell area) that lies between Dixon and Davis. Dixon, the project site, and the entire Kidwell area are in Solano County; Davis and most of the Davis campus of the University of California (U.C. Davis), which lies between the Kidwell area and Davis proper, are in Yolo County. Separating U.C. Davis from the Kidwell area, and roughly perpendicular to I–80, is the South Fork of Putah Creek.

To reach Davis and other points north and east from the Kidwell area, motorists must cross Putah Creek on I–80. At present there is no access to I–80 between the Pedrick Road Interchange, one and one-half miles southwest of the Kidwell project, and Putah Creek, slightly more than a mile to the northeast of the project. State Route 113 diverges

---

**1.** Regulations promulgated to relate the § 128 hearing requirements to the complex series of events by which federal reimbursement of state highway construction costs is authorized have established a two-step hearing procedure, which we considered at some length in *Lathan v. Brinegar*, 9 Cir. *in banc* 1974, 506 F.2d 677, 682–87. Before the exact location of a highway project is approved ("location approval"), there must be a "corridor public hearing," *see* 23 C.F.R. §§ 790.3(a), 790.5(a); before the design of a project is finally determined ("design approval"), there must be a "design public hearing," *see* 23 C.F.R. §§ 790.3(b), 790.5(a). Because location of the segment of I–80 on which the Kidwell Interchange is to be built is a *fait accompli*, only the design public hearing requirements are applicable.

For an excellent explication of the labyrinthine byways of federal highway financing *see* Peterson & Kennan, *The Federal-Aid Highway*

*Program: Administrative Procedures and Judicial Interpretation*, 1972, 2 Env.L.Rep. 50001, 50001–14.

**2.** A 1970 amendment to § 128 requires that applications for federal highway funds include a report indicating the consideration given to the social, economic and environmental effects of the project, and possible alternatives. The implementing regulations again bifurcate this provision, requiring that requests for location approval include a "location study report" and requests for design approval a "design study report." 23 C.F.R. § 790.9(b).

**3.** Technically, the EIS should be prepared by FHWA and the EIR should be prepared by CDHW. We see no good reason, however, why the two cannot be prepared jointly, and embodied in a single document which meets the requirements of both NEPA and CEQA.

from I-80 right at the creek and leads into Davis, but there is no access to this exit except from I-80. Thus, the only present means of getting to I-80 from the Kidwell area, other than Pedrick Road, is via a temporary access opening at grade, slightly northeast of the Kidwell project site. High speed traffic and the absence of conventional ramps makes exit and entry via this opening quite hazardous.

The avowed purpose of the Kidwell Interchange and its network of frontage roads is to replace this temporary access, which soon must be closed to meet Interstate System safety standards. If the interchange is not completed, additional frontage roads will have to be constructed to connect property adjacent to I-80 with the Pedrick Road Interchange. This alternative would require some property owners to drive south to the Pedrick Road Interchange, turn around, and drive back to reach Davis. Understandably the circuity of this route upsets some of these people. Yet the number of people that would be so affected is very small, for almost all of the Kidwell area is lightly populated agricultural land. There are so few people that Solano County has not yet seen fit to

build the road to be called Kidwell Road, which the interchange is supposed to connect to I-80. Thus, the "Kidwell Interchange," to be built, say the defendants, at a cost of $519,000, will upon completion serve only one avowed purpose: providing slightly more convenient freeway access to a handful of local motorists.[4]

The explanation for this curious state of affairs is unmistakable and rather simple: the "Kidwell Interchange" is not being built to meet the existing demand for freeway access but to stimulate and service future industrial development in the Kidwell area which Solano County and the City of Dixon are now planning.[5] Although the entire area is now zoned agricultural, the 1963 Dixon Area General Plan shows a narrow 2120 acre tract between I-80 and the nearly parallel tracks of the Southern Pacific Railroad to the southeast as a "General Industrial Reserve." This tract borders I-80 for almost five miles and extends from the current Dixon City limits to Putah Creek. On the northwest side of I-80 is a 1320 acre tract, triangular in shape, shown on the Dixon General Plan as a "Limited Industrial Reserve." This tract is bounded by Putah Creek and U.C. Da-

4. Residents of the area have also claimed that the interchange will provide a needed crossing for farm vehicles, which currently must cross I-80 via the Pedrick Road Interchange, the turning radius of which assertedly is too tight for safety and convenience. Perhaps, but completion of the Kidwell Interchange and the frontage roads now planned would not improve that situation because there are no plans for a frontage road on the north side of the highway to connect the crossing to existing surface roads. Second, we fail to understand how the need for a crossing requires construction of entry and exit ramps. Third, although our attention has not been directed to any statistics, the fact that the Kidwell area is bounded on the southeast by the Southern Pacific tracks, parallel to and less than a mile from I-80, and on the north and west by Putah Creek and Pedrick Road, the intersection of which is less than two miles from the Kidwell Interchange, strongly disinclines us to believe that very many farm vehicles would use the crossing. Consequently, we doubt that the need for a farm crossing was a major factor, if

it was a factor at all, in the decision to build the interchange.

5. This interpretation is borne out by the user savings calculations utilized by CDHW in its attempts to convince FHWA that the Kidwell Interchange was economically justifiable. The calculations were premised "on the development of the General Industrial Reserve . . . as shown on the Dixon General Plan . . . . along with urbanization stimulated by expansion of the University of California at Davis." Letter from J. A. Legarra, State Highway Engineer, CDHW, to Donald E. Trull, Division Engineer, Bureau of Public Roads (FHWA predecessor), August 19, 1969.

In addition, despite the rural character of the Kidwell area and the defendants' contention that the project's principal purpose is to replace existing at-grade access, the interchange is of the "spread diamond" variety, capable of accommodating large industrial vehicles. Completion of the interchange will force retirement of 86 acres of productive agricultural land.

vis on the north and Pedrick Road on the west. As far as we know there are no immediate plans to rezone, but the Solano County Industrial Development Agency (SCIDA) has already begun to promote a 150 acre "University Research Park" to be located in the Limited Industrial Reserve and very near the proposed interchange.

Obviously the major attraction for the research and high technology concerns that SCIDA hopes to attract is the park's proximity to U.C. Davis. Unless the Kidwell Interchange is completed, the only access to the park will be by frontage road and the Pedrick Road Interchange; thus, the travel distance to the University would be approximately doubled. Also, affidavits submitted by Davis suggest that the absence of an interchange would substantially increase accessibility costs for potential tenants, thereby making the Kidwell area significantly less attractive as an industrial site. Lack of nearby freeway access would probably also dampen SCIDA's plans for the other side of I–80. These plans, apparently not so far along as the "University Research Park," call for encouraging the location of canneries and other food processing plants in the General Industrial Reserve. The importance of trucking in the food processing industry suggests that accessibility costs would be an important factor in plant site selection.

### B. *History of the Project.*

For purposes of federal funding approvals, the Kidwell Interchange was originally made part of a construction project encompassing the widening of a 2.4 mile segment of I–80. The widening, which has now been completed, was necessary to upgrade the segment to full freeway status. CDHW secured federal approval for the basic design features[6] of this freeway segment on February 18, 1958, but at that time the plans did not include the interchange. Eight months later, on October 21, 1958, CDHW and Solano County executed a "freeway agreement," required by state law because the project necessitated elimination of property owners' at-grade access to the then U.S. 40. The agreement only obligated the state to replace the existing access with parallel frontage roads connecting adjacent land with the Pedrick Road Interchange.

Owners of some of this property were disturbed by the proposed elimination of their access and complained to the county, which agreed to reopen the access question with CDHW. The outcome of renewed negotiations, say the defendants, was an "agreement in principle" in 1962 between FHWA, CDHW and Solano County that an interchange would be built somewhere between Pedrick Road and Putah Creek. If indeed. there was such an agreement it was shortlived, for when FHWA advised CDHW that full federal funding would not be provided for the additional work, CDHW refused to execute a revised freeway agreement obligating it to construct the interchange. Thus, despite the fact that the 1963 Dixon General Plan clearly contemplated an interchange in the Kidwell area, it was not until July 7, 1970, that the county and CDHW signed a revised freeway agreement providing for the Kidwell project. FHWA had evidently changed its position on federal money by that time, but neither the exact date nor the reasons for this reversal are clear from the record. We do know that FHWA granted "basic design approval" to the project in the middle of 1969, but quickly withdrew it when it became clear that the state and county did not plan to create "Kidwell Road" before or contemporaneously with construction of the interchange. The stated reason for the withdrawal was that unless Kidwell

---

**6.** This approval is to be distinguished from "design approval." The latter is a term of art created by PPM 20–8, originally promulgated on January 17, 1969. Peterson & Kennan, *supra,* 2 Env.L.Rep. at 50013.

Road was built traffic would be insufficient to justify the project.[7]

In any event, is seems clear that FHWA did agree to provide federal funds sometime before July 16, 1971, for on that date it concurred in CDHW's three-page "Negative Declaration of Environmental Impact" covering both the widening and the proposed interchange.

The Negative Declaration, which can fairly be described as cursory, concluded that neither the interchange nor the widening would have any significant adverse environmental effects,[8] thereby announcing, albeit implicitly, that no Environmental Impact Statement would be prepared.[9] Marked "for your information," the Negative Declaration was circulated to a wide variety of organiza-

7. Letter from Donald E. Trull, Division Engineer, FHWA, to J. A. Legarra, State Highway Engineer, CDHW, October 14, 1969.

8. Pertinent parts of the Negative Declaration are as follows:

*Location and Description of the Project*

It is proposed to improve the last remaining section of four-lane expressway on Interstate Route 80 between San Francisco Bay and Sacramento to full freeway standards. The proposed facility, from 5.1 to 2.7 miles southwest of the Yolo County Line, will connect to a six-lane freeway section on the west end and to a previously approved eight-lane freeway with two auxiliary lanes on the east end, and will include an interchange with the proposed Kidwell Road.

*Purpose*

This area, in conjunction with the 2.5-mile section immediately adjacent on the east, constitutes what many believe to be the most severe traffic bottleneck in northern California. The project as proposed will relieve congestion, provide better traffic service and a safer facility by eliminating at-grade intersections and expanding the lateral clearances.

Local governmental and private entities are currently planning research and light industrial development in the proposed Kidwell Road area. This area, currently devoted to open, irrigated farms, is about to undergo a rapid change to urban development. This University-oriented development is readily predictable based on the area's proximity to the University of California Campus at Davis. The freeway and the Kidwell Road Interchange will provide direct and safe access between the educational, medical, agricultural, and engineering facilities of the University and the proposed industrial research center.

*Discussion of Environmental Impact*

This project involves no alignment relocation. Necessary right of way is limited to widening the existing highway corridor to accommodate additional traffic lanes and frontage roads, and for the proposed Kidwell Road Interchange.

\* \* \* \* \* \*

The route traverses lands that are primarily devoted to agricultural use; namely open, irrigated, row crop farming. Approximately 86 acres of farm land will be required for this highway project. This commitment of land is considered necessary to support the increasing traffic needs and the anticipated change in land use in the Kidwell Road area as noted previously.

\* \* \* \* \* \*

The natural form of the land will remain unchanged from its present flat, treeless appearance. The Kidwell Road Interchange is planned as a spread diamond with the ramps remaining at ground level. Standard erosion control measures consisting of seeding and strawing are proposed for the fill slopes.

*Basis of Negative Declaration*

The project is not considered to have a significant effect upon the environment for the following reasons:

1. There is no change in the location of the present route. The project proposes improvement of an existing facility with no significant change in the natural form of the land.
2. There are no unique land uses involved within the project.
3. No residential units are involved and no people will be displaced.
4. The project does not affect any parks, recreation areas or wildlife and waterfowl refuges.
5. Completion of this project will result in improved safety and access between the entire North Bay Area and the year-round recreational areas of the High Sierras.
6. There will be no change in the character or composition of traffic. Although lanes will be added on the outside, noise and air pollution aspects are not considered adverse since there is no close-by development.
7. The Association of Bay Area Governments and the County of Solano concur with the proposed construction.

9. 42 U.S.C. § 4332(2)(C) requires an EIS only for proposed major federal action "significantly affecting the quality of the human environment." PPM 90–1, Appendix F, ¶ 4, 2 Env.L. Rep. 46106, 46111 (August 24, 1971) permits use of a negative declaration in lieu of an EIS when federal action will not have significant environmental effects.

tions, individuals and governmental bodies, including Davis, but no adverse comments were received by CDHW.

Thereafter, instead of holding "design public hearings" and seeking "design approval," as then required by PPM 20–8, CDHW sought PS&E approval,[10] which FHWA granted on April 18, 1972. Following PS&E approval the project progressed rapidly. CDHW was authorized to advertise for bids on May 30, 1972, and the contract was awarded on September 28, 1972. Site preparation began three days later, and by the time Davis filed its complaint, October 24, 1972, a substantial amount of work had been completed.[11]

## II. *STANDING.*

■ *Association of Data Processing Service Organizations, Inc. v. Camp,* 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184, sets out a two-part test for standing: a plaintiff must allege that the challenged action has caused him "injury in fact, economic or otherwise," *id.* 397 U.S. at 152, 90 S.Ct. at 829, and the interest he seeks to protect must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *id.* at 153. Also, "the 'injury in fact' test

requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton,* 1972, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636.

### A. *Injury in Fact.*

■ NEPA, as we recently observed, is essentially a procedural statute. *Lathan v. Brinegar, supra,* 506 F.2d at 693; *Calvert Cliffs' Coordinating Committee v. A. E. C.,* 1971, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1112. It requires federal agencies contemplating major action to follow a procedure—preparing and considering an EIS—whenever the proposed action may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Failing to follow this procedure creates a risk that serious and avoidable environmental consequences of the action, which an EIS would reveal, will not be brought to the attention of agency decisionmakers. Thus, if a particular project does in fact entail serious but nonobvious environmental impacts, agency failure to prepare an EIS may mean that the last opportunity to eliminate or minimize these impacts, in accordance with NEPA's broad objectives, has been lost.[12] Were we to agree with the district court

---

10. "PS&E approval" refers to 23 U.S.C. § 106, which requires state highway departments to submit to the Secretary of Transportation (in practice to FHWA) for approval "such surveys, plans, specifications, and estimates for each proposed project . . . as the Secretary may require." In seeking PS&E approval subsequent to the effective dates of NEPA and the 1968 and 1970 amendments to the Federal-Aid Highway Act, CCHW was required to comply with the public hearing and other requirements of 23 U.S.C. § 128. *Lathan v. Brinegar, supra,* 506 F.2d at 685–90. Such compliance being a prerequisite to PS&E approval, we question whether the approval received by CDHW was valid.

11. The district court found that 50% of the interchange had been completed, but this estimate may include the widening portion of the project, because CDHW's design study report states that $184,000 of work was completed before entry of the preliminary injunction and that $335,000 of work remains.

12. While the narrow purposes of the EIS requirement are to inform the public and agency decisionmakers of the environmental consequences of federal action, *see Trout Unlimited v. Morton,* 9 Cir., 1974, 509 F.2d 1276, 1282, the broader objectives of NEPA clearly encompass agency use of the environmental information developed in an EIS to minimize environmental damage to the greatest extent possible consistent with other important objectives. This is what NEPA is all about. *See* 42 U.S.C. § 4331(a): "[I]t is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." *And see Lathan v. Brinegar, supra,* 506 F.2d at 687–88; *Calvert Cliffs' Coordinating Committee v. A. E. C., supra,* 449 F.2d at 1112–15.

that a NEPA plaintiff's standing depends on "proof" that the challenged federal project *will* have particular environmental effects,[13] we would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake. Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs. It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an EIS.

■ The procedural injury implicit in agency failure to prepare an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient "injury in fact" to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project` that he may be expected to suffer whatever environmental consequences the project may have. This is a broad test, but because the nature and scope of environmental consequences are often highly uncertain before study we think it an appropriate test.

■ Davis has met the test. Because of its proximity to the Kidwell project it may be expected to suffer a wide variety of environmental consequences that it alleges will result from the interchange, if in fact the allegations have substance. Specifically Davis has alleged, *inter alia,* that the planned industrial development which the interchange will make possible may adversely affect the quality and quantity of the city water supply because of increased use and the danger of contamination by industrial wastes, and that the development will cause an influx of population that will frustrate the city's policy of "controlled growth" and render its planning efforts to date obsolete. The facts and expert opinions submitted by Davis raise substantial questions about the environmental effects of the Kidwell Interchange upon Davis. This is enough to satisfy the "injury in fact" test insofar as NEPA is concerned.

Davis has also passed muster under *Sierra Club v. Morton, supra,* in that the environmental effects alleged would affect interests of the city itself. In its municipal capacity Davis is authorized to provide for city water service, Cal.Gov't Code § 38742, and required to develop and adopt a general plan, Cal.Gov't Code §§ 65300–03. *Cf. Washington Utilities & Transportation Commission v. F.C.C.,* 9 Cir., 1975, 513 F.2d 1142, at 1146–1151. Whether Davis' municipal interests are non-economic or unquantifiable is immaterial. *United States v. SCRAP,* 1973, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254; *Sierra Club v. Morton, supra,* 405 U.S. at 734, 92 S.Ct. 1361; *Washington Utilities & Transportation Commission v. F.C.C., supra,* 513 F.2d at 1149. Nor does attenuation of the causal link between the alleged failure to comply with NEPA and the possible substantive injury to Davis' municipal interests defeat standing. *See United States v. SCRAP, supra,* 412 U.S. at 689 n. 14, 93

---

13. In ruling that Davis lacked standing under NEPA and CEQA, but could sue under § 128, the district court said:

> Clearly, the opportunity to be heard in appropriate forums, to tender suggestions, voice objections, and be informed of opposing points of view are integral, essential elements of these planning functions. Indeed, the Section 128 hearing and prehearing procedures . . . have been held to be a "fundamental right" of great importance. . . . Thus, *in contrast to the normal requisites of standing in environmental lawsuits which require plaintiff to plead and prove actual damage ensuing from a statutory violation,* the deprivation of the Section 128 hearing procedures constitutes, in and of itself, injury in fact to one of the City of Davis's municipal interests. This court therefore concludes that plaintiff has *proved* standing. . . .
> (emphasis added).

The court's statement of the normal test of standing in environmental lawsuits is erroneous, at least insofar as it was intended to relate to NEPA.

S.Ct. 2405; *Washington Utilities & Transportation Commission v. F.C.C., supra,* 513 F.2d at 1149.

Implicit in Davis' allegations is another "injury in fact" that is sufficient to support standing. § 102(2)(C) of NEPA states as follows:

> Copies of [the environmental impact] statement and the comments and views of the appropriate Federal, State, and *local agencies,* which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, *and shall accompany the proposal through the existing agency review processes;* . . .

42 U.S.C. § 4332(2)(C) (emphasis added).

Because Davis' responsibility for promulgating a general plan encompasses development and enforcement of environmental standards, *see* Cal.Gov't Code §§ 65302, 65303, this language entitles the city to comment on any EIS covering the Kidwell project and to have its comments considered with the EIS during FHWA review. Thus, failure to file an EIS deprives Davis of its opportunity to participate in the administrative decisionmaking process.

**B.** *Arguably Within the Zone of Protected Interests.*

■ The policies underlying NEPA are extremely broad, *see* 42 U.S.C. § 4331, and the environmental interests it seeks to protect are shared by all citizens. In a sense, therefore, the intended beneficiaries of NEPA are individual citizens; but the statute expressly contemplates that state and local governments are to play an important role in the effectuation of national environmental policy. *See* 42 U.S.C. §§ 4331(a), 4332(2)(C), 4332(2)(F), 4341(4), 4345(1). Thus, while a municipality's interest in agency compliance with NEPA in one sense derives from the interests of its citizens in avoiding the consequences of environmental damage, under California law it is the municipality which is entrusted with protection of certain of these environmental interests, by virtue of statutory duties to develop and enforce a general plan, to ˙maintain or contract for a municipal water supply, and so on. Accordingly we hold that Davis' municipal interests fall within the scope of NEPA's protections. *Cf. Washington Utilities & Transportation Commission v. F.C.C., supra,* 513 F.2d at 1151–1152.

The fact that § 102(2)(C) expressly contemplates local government participation in the EIS review process also indicates that Davis is "arguably within the zone" of NEPA's procedural safeguards.[14]

**C.** *CEQA Standing.*

■ CEQA, as the California courts have recognized, was modeled after NEPA, and despite substantial differences in its detailed provisions CEQA's purposes are almost identical to those of NEPA. *See Friends of Mammoth v. Board of Supervisors of Mono County,* 1972, 8 Cal.3d 247, 260–61, 104 Cal.Rptr. 761, 769–70, 502 P.2d 1049, 1057–58. Thus, failure to prepare an EIR, like failure to prepare an EIS, does a procedural injury to persons or entities having a geographical nexus with the site of the challenged project; Davis has standing, therefore, under CEQA, for the same reasons it has standing to sue under NEPA. *See Bozung v. Local Agency Formation Commission of Ventura County,* 1975, 13 Cal.3d 263, 272, 118 Cal.Rptr. 249, 254–55, 529 P.2d 1017, 1022–23.

---

**14.** Having concluded that Davis has standing under the *Data Processing—Sierra Club* standards, we need not consider whether standing might also be based on the theory of *parens patriae. See Washington Utilities & Transportation Commission v. F. C. C., supra,* 513 F.2d at 1152–1154. We note, however, that Davis may represent the environmental interests of its citizens in any event. A plaintiff who establishes standing in its own right may then argue the public interest as well. *Sierra Club v. Morton, supra,* 405 U.S. at 737, 92 S.Ct. 1361.

## III. *NEPA and CEQA.*

Because it found standing lacking, the district court did not reach Davis' claim that the defendants should have prepared an EIS/EIR. As a consequence of the court's mistaken impression that proof of environmental damage is a prerequisite of standing, however, the parties did address below the significance of the Kidwell project's environmental impact, and that is the relevant question in determining whether an EIS or an EIR is required. Moreover, since the date of the district court's decision this court has recognized that there is a close relationship between NEPA and the § 128 issues raised on this appeal. *Lathan v. Brinegar, supra,* 506 F.2d at 687–689. For these reasons, and in the interests of expediting this litigation, we think it appropriate for us to decide the EIS/EIR issues now. The current record makes it clear that the decision not to prepare an EIS/EIR cannot be squared with either NEPA or CEQA.

### A. *Standard of Review.*

■ NEPA requires preparation of a detailed EIS for all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This threshold test is met when a plaintiff "allege[s] facts which, if true, show that the proposed project would materially degrade any aspect of

environmental quality."[15] *Environmental Defense Fund v. Armstrong,* 9 Cir., 1973, 487 F.2d 814, 817 n. 5; *Save Our Ten Acres v. Kreger,* 5 Cir., 1973, 472 F.2d 463, 466. This standard does not require the courts to determine whether a challenged project *will in fact* have significant effects. Rather, we are to determine whether the responsible agency has "reasonably concluded" that the project will have no significant adverse environmental consequences. *Save Our Ten Acres v. Kreger, supra,* 472 F.2d at 467.

■ In making this determination, however, we must bear in mind the inherent danger that the most serious environmental effects of a project may not be obvious, and that the purpose of the EIS requirement is to ensure that "to the fullest extent possible" agency decisionmakers have before them and take into proper account a complete analysis of the project's environmental impact. *Calvert Cliffs' Coordinating Committee v. A.E.C., supra,* 449 F.2d at 1114. Thus, where substantial questions are raised as to whether a project will have significant adverse impacts it is hardly reasonable for an agency to conclude, prior to study, that an EIS is not required. Accordingly, an EIS must be prepared whenever a project *"may* cause a significant degradation of some human environmental factor." *Save Our Ten*

---

**15.** The circuits have split on the question of whether federal action that significantly affects the environment must also be "major" in an economic or some other nonenvironmental sense to trigger the EIS requirement. We incline to the views expressed in *Minnesota Public Interest Research Group v. Butz,* 8 Cir. *in banc,* 1974, 498 F.2d 1314, 1321–22:

> To separate the consideration of the magnitude of federal action from its impact on the environment does little to foster the purposes of the Act, *i. e.,* to "attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences." By bifurcating the statutory language, it would be possible to speak of a "minor federal action significantly affecting

the quality of the human environment," and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment.

*Cf. Wyoming Outdoor Coordinating Council v. Butz,* 10 Cir., 1973, 484 F.2d 1244; *Environmental Defense Fund v. Tennessee Valley Authority,* 6 Cir., 1972, 468 F.2d 1164. *But see Hanly v. Mitchell,* 2 Cir., 1972, 460 F.2d 640; *Scherr v. Volpe,* 7 Cir., 1972, 466 F.2d 1027. Thus, we confine ourselves on this appeal to determining whether the defendants reasonably concluded that the Kidwell project will have no significant environmental effects.

*Acres v. Kreger, supra,* 472 F.2d at 467 (emphasis added).[16]

The CEQA test for determining the necessity of an EIR is similar. Public Resources Code § 21100 requires an EIR whenever a proposed project "may have a significant effect on the environment." The California Supreme Court has indicated that the threshold for application of this requirement is low: an EIR must be prepared "whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental impact." *No Oil, Inc. v. City of Los Angeles,* 1974, 13 Cal.3d 68, 75, 82–86, 118 Cal.Rptr. 34, 38, 43–46, 529 P.2d 66, 70, 75–78. Also, "the existence of serious public controversy concerning the environmental effects of a project in itself indicates that preparation of an EIR is desirable." *Id.* 13 Cal.3d at 86, 118 Cal.Rptr. at 46, 529 P.2d at 78.

B. *The Standard Applied.*

The Negative Declaration prepared by CDHW, see n. 8, *supra,* portrays the Kidwell Interchange as a mere accessory accommodation to inevitable industrial development. Such a portrayal stands reality on its head. Without the Kidwell Interchange, development may not be inevitable; with it, development may be inevitable. The Director of the Solano County Industrial Development Agency asserts that only three prospective ten-

ants have to date shown serious interest in the "University Research Park." Perhaps other prospects have realized the truth of that which Solano County and the other defendants deny: that the interchange is an indispensible prerequisite to rapid development of the Kidwell area. Without it, accessibility costs for industrial plants may rise appreciably, and the driving distance to U.C. Davis will at least double—hardly a major selling point for a development whose appeal consists almost entirely of its close proximity to the campus. Thus, the Kidwell Interchange must be seen as an essential catalyst for the fruition of Solano County's plans.

The Negative Declaration is nothing more than bureaucratic doubletalk. "No development presently exists," we are told, but the area "is about to undergo a rapid change to urban development" because of its proximity to U.C. Davis, and the interchange will provide "direct and safe access between . . . the University and the proposed industrial research center." Although the "proximity" to U.C. Davis will in practical terms result from the access created by the interchange, the conclusion drawn is that the project's environmental effects will not be significant.

This is totally inadequate. Regardless of the weight accorded to the expert opinions and supporting data submitted by Davis, it is obvious that constructing

16. *Accord, Minnesota Public Interest Research Group v. Butz, supra,* 498 F.2d at 1320 [An initial decision not to prepare an EIS precludes the full consideration directed by Congress. In view of the concern for environmental disclosure present in NEPA, the agency's discretion as to whether an impact statement is required is properly exercised only within narrow bounds. Action which *could have* a significant effect on the environment should be covered by an impact statement."] (emphasis added); *Maryland-National Capital Park and Planning Commission v. United States Postal Service,* 1973, 159 U.S.App.D.C. 158, 487 F.2d 1029, 1039; *Wyoming Outdoor Coordinating Council v. Butz, supra,* 484 F.2d at 1248–49; *Hanly v. Kleindienst,* 2 Cir., 1972, 471 F.2d 823, 838 (Friendly, J., dissenting); *SCRAP v. United States,* D.D.C., 1972, 346 F.Supp. 189, 200–01 (J. Skelly Wright, J., for three-judge court) ["It should be obvious that the NEPA requirements

cannot be circumvented by so transparent a ruse [as a simple assertion by the ICC that its order would have no significant impact]. The main purpose of an impact statement is to force assessment of the environmental impact of the proposed action. Therefore, a statement is required whenever the action *arguably* will have an adverse environmental impact."]. *But see Hanly v. Kleindienst, supra,* 471 F.2d at 828–29, 836 (adopting the "arbitrary and capricious" standard, but requiring that agencies develop a reviewable administrative record concerning the decision not to prepare an EIS, including notice to the public and an opportunity to submit comments); *Echo Park Residents Committee v. Romney,* C.D.Cal., 1971, 2 Env.L.Rep. 20337; *Goose Hollow Foothills League v. Romney,* D.Or., 1971, 334 F.Supp. 877.

a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists will have a substantial impact on a number of environmental factors. That this is so is recognized in the Department of Transportation's own PPM 90–1, August 24, 1971, 2 Env.L.Rep. 46106, which governs preparation of impact statements for federal-aid highway projects:

> The improved access and transportation afforded by a highway may generate other related actions that could reach major proportion and which would be difficult to rescind. An example would be a highway improvement which provides access to a nonaccessible area, acting as a catalyst for industrial, commercial, or residential development of the area. *Id.*, Appendix E, ¶ 2f, 2 Env.L.Rep. at 46110.

The growth-inducing effects of the Kidwell Interchange project are its raison d'être, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services such as utilities, education, police and fire protection, and recreational facilities. The expert opinions and studies that Davis has submitted during this litigation bolster the conclusion that CDHW, when it prepared the Negative Declaration, could not have known enough about the environmental effects of this project to "reasonably conclude" that they would not be significant. Here are some of the things that the studies show:

1. The water table in the Davis area has been declining for a number of years. Since the last study was completed five years ago, the problem may have become worse. On the basis of the earlier studies, however, there is a possibility that industrial development in the Kidwell area would place demands on Davis' water supply which could not be met indefinitely. The declining water table has also created a depression or "sink" in ground water levels, and the lowest levels are directly beneath Davis. If this depression has worsened since the last study, industrial wastes emanating from the Kidwell area might seep into this "sink" and contaminate the city's water supply.

2. Another casualty of the Kidwell development might be Davis' policy of "controlled growth"; the city has decided to resist becoming a bedroom community by restricting all but "internal" growth. The influx of highly educated employees that the research oriented Kidwell development would require would tend to increase Davis' population disproportionately because of the city's unique academic and cultural amenities. This possibility is even more alarming to Davis in view of the fact that there is already a housing shortage in Davis.

3. A rapid increase in population brought on by development would require expanded residential development, probably on currently productive agricultural acreage. Residential expansion would bring on increased commercial development and the beginnings of urban sprawl. The demand for all city services would increase, but the ultimate cause of the increase, industrialization, would be immune from the increased taxes necessary to supply the demand, because the Kidwell area is in Solano County.

We cannot, of course, predict with certainty that any of these consequences, or others, will result, in either the short or long term, from construction of the Kidwell Interchange. The nature and extent of development which the project will induce is still uncertain. Davis' fears may be exaggerated. But currently available information and plain common sense indicate that it was hardly "reasonable" for CDHW or FHWA to conclude, without further study, that the environmental impact of the proposed interchange will be insignificant. We think that this is precisely the kind of situation Congress had in mind when it enacted NEPA: substantial questions have been raised about the environmental consequences of federal action, and the responsible agencies should not be allowed to proceed with the proposed action in ignorance of what those conse-

quences will be. NEPA and CEQA require that the interchange's environmental impact be studied and analyzed in good faith before CDHW and FHWA decide whether the project is to be completed as planned, or to be modified or abandoned. Davis has raised disturbing questions. It is now up to the defendants to answer those questions.[17]

■ We reject CDHW's position that the uncertainty of development in the Kidwell area makes the "secondary" environmental effects of the interchange too speculative for evaluation. Certainly the assertion that there may be no development even if the interchange is built taxes credulity (as well as being inconsistent with the assertion that development is inevitable). What we have here, after all, is a proposal to build a major interchange in an agricultural area near the edge of urban development, and the purpose of the project is to connect a freeway with a road which does not yet exist. If the interchange is built, development will occur. And regardless of its nature or extent, this development will have significant environmental consequences for the surrounding area, including Davis. It is true that the development potential which the interchange will create comprehends a range of possibilities. The ultimate outcome will depend on the plans of private parties and local government outside the direct control of state and federal government. In this context the purpose of an EIS/EIR is to evaluate the possibilities in light of current and contemplated plans and to produce an informed estimate of the environmental consequences. That the exact type of development is not known is not an excuse for failing to file an impact statement at all. Uncertainty

about the pace and direction of development merely suggests the need for exploring in the EIS/EIR alternative scenarios based on these external contingencies. Drafting an EIS/EIR necessarily involves some degree of forecasting.

While "foreseeing the unforeseeable" is not required, an agency must use its best efforts to find out all that it reasonably can:

> It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry."

*Scientists' Institute for Public Information v. A. E. C.,* 1973, 156 U.S.App. D.C. 395, 481 F.2d 1079, 1092.

Nor does characterization of industrial development as a "secondary" impact aid the defendants. As the Council on Environmental Quality only recently pointed out, consideration of secondary impacts may often be more important than consideration of primary impacts.[18]

> Impact statements usually analyze the initial or primary effects of a project, but they very often ignore the secondary or induced effects. A new highway located in a rural area may directly cause increased air pollution as a primary effect. But the highway may also induce residential and industrial growth, which may in turn create substantial pressures on available water supplies, sewage treatment fa-

---

17. *Cf. No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at 85, 118 Cal.Rptr. at 45, 529 P.2d at 77:

"The very uncertainty created by the conflicting assertions made by the parties as to the environmental effect . . . underscores the necessity of the EIR to substitute some degree of factual certainty for tentative opinion and speculation."

18. We do not say that secondary impacts are *always* more important, or even that they must *always* be considered in an EIS. *See Trout Unlimited v. Morton, supra,* 509 F.2d at 1283 n. 9. Here it is clear that the secondary impacts may be significant and they must therefore be included in the EIS.

cilities, and so forth. For many projects, these secondary or induced effects may be more significant than the project's primary effects.

\* \* \* \* \* \*

While the analysis of secondary effects is often more difficult than defining the first-order physical effects, it is also indispensable. If impact statements are to be useful, they must address the major environmental problems likely to be created by a project. Statements that do not address themselves to these major problems are increasingly likely to be viewed as inadequate. As experience is gained in defining and understanding these secondary effects, new methodologies are likely to develop for forecasting them, and the usefulness of impact statements will increase.

*Fifth Annual Report of the Council on Environmental Quality,* 410–11 (December 1974).

 The defendants have also objected that the environmental consequences of development will result from local and private action, not federal action, and that therefore they need not consider the consequences of development in determining whether an EIS is required. They are wrong. It must be remembered that the main purpose of the interchange, and its only credible economic justification, is to provide access to the Kidwell area for future industrial development. The argument that the principal object of a federal project does not result from federal action contains its own refutation. *See National Forest*

Preservation Group v. Butz, 9 Cir., 1973, 485 F.2d 408, 411–12. Thus, we hold that NEPA requires consideration of the effects of the planned development.[19]

C. *Laches.*

 We reject defendants' contention that the NEPA and CEQA claims are barred by laches. While Davis received a copy of the Negative Declaration in the summer of 1971, we cannot, on the facts of this case, conclude that it "slept on its rights" by failing to file suit until October 24, 1972. Laches requires more than delay; it requires a lack of diligence. *Costello v. United States,* 1961, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551; *Lathan v. Brinegar, supra,* 506 F.2d at 691–92. An indispensable element of lack of diligence is knowledge, or reason to know, of the legal right, assertion of which is "delayed." The complexity and uncertainty of the law applicable to this case makes us most reluctant to charge Davis with the knowledge requisite to invocation of the equitable doctrine of laches.

 A Davis official received the Negative Declaration, a document apparently not then authorized by any published, readily available regulation or PPM,[20] marked "for your information." The Negative Declaration did not indicate that comments were being solicited nor that the decision not to file an EIS/EIR, which was not expressly acknowledged, was open to challenge in the courts. Further, the statutes on which Davis now relies—NEPA, CEQA and 23 U.S.C. § 128—are not now and certainly were not then easy statutes to understand.[21] In 1971 judicial interpre-

19. *Cf. Scientists' Institute for Public Information v. A. E. C., supra,* 481 F.2d at 1088–89; *Bozung v. Local Agency Formation Commission of Ventura County, supra,* 13 Cal.3d at 279–81, 118 Cal.Rptr. at 259–61, 529 P.2d at 1027–29.

The defendants in this case make another argument that was rejected in *Bozung*: that no EIR is required now because an EIR will be required when the developers seek to have their Kidwell area property rezoned from agricultural. We agree with the California Supreme Court that this fact is no justification for the failure to prepare an impact statement.

*See id.* at 282–86, 118 Cal.Rptr. at 262–265, 529 P.2d at 1030–33.

20. PPM 90–1, which authorized Negative Declarations where Department of Transportation officials conclude that federal actions are not major or will not significantly affect the environment, was promulgated on August 24, 1971. An earlier "draft instructional memorandum," dated November 24 or 30, 1970, may have previously provided for Negative Declarations, but it apparently was never published.

21. *See generally* Peterson & Kennan, *supra,* 2 Env.L.Rep. at 50001–17.

tations and critical commentary were just beginning to appear, whereas the confusing avalanche of interpretative regulations, PPM's DOT Orders and "draft instructional memoranda" was already well underway. In light of the situation in 1971, we think that ignorance of its legal rights by Davis prior to retention of outside counsel in early October, 1972, is more than understandable. There is no evidence that the city knowingly slept on its rights.

■ We also think that this is an inappropriate case for laches because of the kinds of issues raised. Davis will not be the only victim of possible environmental damage that might follow the defendants' failure to comply with NEPA and CEQA. The brunt of any such damage will be borne by individuals residing in Davis and other nearby communities. NEPA was enacted to protect the environmental interests of all citizens by making consideration of environmental factors a primary duty of all federal agencies. *Environmental Defense Fund v. Tennessee Valley Authority,* 6 Cir., 1972, 468 F.2d 1164, 1182–83; *City of New York v. United States,* E.D.N.Y., 1972, 337 F.Supp. 150, 160 (Friendly, J. for three-judge court). CEQA has the same purpose in California. To make faithful execution of this duty contingent upon the vigilance and diligence of particular environmental plaintiffs would encourage attempts by agencies to evade their important responsibilities. It is up to the agency, not the public, to ensure compliance with NEPA in the first instance. *See Minnesota Public Interest Research Group v. Butz,* 8 Cir. *in banc,* 1974, 498 F.2d 1314, 1324; *Wyoming Outdoor Coordinating Council v. Butz,* 10 Cir., 1973, 484 F.2d 1244, 1250–51; *Environmental Defense Fund v. Tennessee Valley Authority, supra,* 468 F.2d at 1182–83; *Arlington Coalition on Transportation v. Volpe,* 4 Cir., 1972, 458 F.2d 1323, 1329; *cf. Lathan v. Brinegar, supra,* 506 F.2d at 692.[22] The courts have

a corresponding responsibility to insist on "full, fair, bona fide compliance" with NEPA by all federal agencies. *Lathan v. Brinegar, supra,* 506 F.2d at 693. We would be remiss if we exercised our discretion to invoke laches in cases like this one.

### IV. *23 U.S.C. § 128.*

### A. *Relationship to NEPA.*

■ In *Lathan v. Brinegar, supra,* 506 F.2d at 690–91, we held that the public hearings required by § 128 must consider not only the matters specified in that section and its implementing regulations but the factors enumerated in NEPA as well:

> [T]he hearing under section 128(a) . . . will not be merely a new "corridor" or "location" hearing or "design" hearing . . . . The major focus must be on the total impact of the project as a whole, including whether it should be built at all, as well as whether, if it is to be built, it should be built where and as previously planned.

> *Id.* at 690.

We also expressed grave doubts that adequate consideration of the factors specified in NEPA could occur in the absence of a properly detailed and documented EIS. We have similar doubts here.

The purpose of the hearings required by § 128 is

> to afford full opportunity for effective public participation in the consideration of highway location and design approvals,

and

> to give all interested persons an opportunity to become fully acquainted with highway proposals of concern to them.

> 23 C.F.R. §§ 790.1(a), 790.1(b).

How can public participation be "effective" or acquaintance with highway proposals "full" when the public is denied access to the vital environmental data and analysis which a properly detailed

---

**22.** *Accord, County of Inyo v. Yorty,* 3d Dist., 1973, 32 Cal.App.3d 795, 812–15, 108 Cal.Rptr. 377, 389–90.

EIS would provide? *See Lathan v. Brinegar, supra,* 506 F.2d at 690–91. Section 128 requires state highway departments to certify that the social, economic and environmental effects of highway projects have been "considered." Unless "consider" in this context means no more than "speculate," how can a state highway department "consider" environmental effects without the aid of a detailed EIS? The environmental impacts of a project are not always obvious. Without the study and analysis which an EIS necessarily includes, the most serious environmental effects may not timely come to the attention of agency decisionmakers. This is precisely the danger which it is the purpose of NEPA and § 128 to avoid. *Calvert Cliffs' Coordinating Committee v. A.E.C., supra,* 449 F.2d at 1114. Thus, we think "consider" in this context means to investigate and analyze, not merely to speculate on the basis of information that is already available, however incomplete.[23]

 Unless "consideration" encompasses an affirmative duty to investigate and compile data on social, economic and environmental effects, and a further duty to incorporate that data into a detailed, reasoned analysis of the project's social, economic and environmental impact, it is difficult to understand the congressional motivation for adding to § 128 in 1970 an amendment requiring state highway departments to prepare reports "indicating" the consideration given social, economic and environmental effects and possible alternatives. This requirement clearly contemplates independent review by FHWA (and by the courts if necessary) of state highway department investigation and consideration of social, economic and environmental effects to determine whether the procedure required by law has been observed. Meaningful review is clearly impossible where, as in the present case,

the study report contains no more than the state highway department's unsupported speculation that the project in question may, at some unspecified time in the future, have some unspecified social, economic or environmental impact.

 In view of the above it is plain that CDHW's design study report fails to deal adequately even with the factors specified in § 128, to say nothing of the matters enumerated in NEPA. The deficiencies are set out with particularity below. Because of them, we need not consider whether the defendants' failure to file an EIS is independently sufficient to defeat compliance with § 128, as well as being in violation of NEPA. *See Lathan v. Brinegar, supra,* 506 F.2d at 690, 694, 695. But we stress that before the new hearings which the failure to comply with § 128 will require, the EIS which the defendants must prepare must be made available to the public so that views based on accurate and complete environmental information may be expressed by the participants in the new hearings. *See id.* at 691. And we reiterate what we said in *Lathan:* grudging *pro forma* compliance with NEPA is not enough. The new EIS should include a full study and analysis of the environmental effects of the interchange itself and of the development potential that it will create. To require less would defeat the important objectives of § 128 and of NEPA.

B. *Deficiencies in the Design Study Report (DSR).*

1. *Social, economic and environmental effects.*

Section 128 requires that CDHW consider "the economic and social effects [of the proposed project and] its impact on the environment." 23 C.F.R. § 790.3(c), which implements this requirement, provides more specifically that state highway departments are to consider:

---

**23.** We do not say that an EIS/EIR or a § 128 study report need contain *all* environmental information that can possibly be gathered, regardless of the costs or delay involved. *Cf. Jicarilla Apache Tribe of Indians v. Morton,* 9

Cir., 1973, 471 F.2d 1275. *Jicarilla* does not justify an agency's complete failure to conduct any studies or to include any discussion in an EIS or DSR with respect to significant environmental effects.

the direct *and indirect* benefits or losses to the community and to highway users [including] effects that are relevant and applicable to the particular location or design under consideration as to:

(1) Regional and community growth, including general plans and proposed land use, total transportation requirements, and status of the planning process.

(2) Conservation and preservation including . . . the general ecology of the area as well as manmade and other natural resources, . . .

(3) Public facilities and services including religious, health and educational facilities; and public utilities, fire protection and other emergency services.

(4) Community cohesion including residential and neighborhood character and stability, . . . and effects on local tax base and property values.

(5) Displacement of people, businesses, and farms. . . .

(6) Air, noise and water pollution including consistency with approved air quality implementation plans. . .

(7) Aesthetic and other values. . .

The DSR itself contains little discussion of social, economic and environmental effects. Rather, it incorporates by reference the Negative Declaration and a second document, fifty pages long, denominated "Additional Environmental Evaluation" (AEE).[24] The cursory Negative Declaration, discussed above, certainly is in no way indicative of proper environmental consideration. The AEE, which was completed more than a month in advance of the design public hearings,[25] does discuss the "primary" impact of the interchange, but fails to explore the "secondary" or "indirect" impact: the social, economic and environmental effects of the planned industrial development. These effects are dismissed as "speculative" and "uncertain." For reasons that we have stated relating to NEPA, this will not do.

The purposes of § 128, as amplified by NEPA, are ill-served by rigid bifurcation of potential social, economic and environmental effects into those which are "primary" or "direct" and those which are "secondary" or "indirect."

From what we have said in our discussion of NEPA, the Kidwell project's high potential for inducing serious "secondary" effects should be evident. Yet despite the factors enumerated in 23 C.F.R. § 790.3(c), which became effective before the date of the design public hearings, the AEE contains no detailed discussion of the project's probable impact on

---

24. The DSR also contains a few CDHW responses to comments made at the hearings, but only a few of these responses relate to social, economic and environmental factors; for the most part the positions taken in the AEE are merely restated. There is no indication that any of the public hearing comments caused CDHW to undertake further studies or to reanalyze its position.

25. Davis argues that preparation of the AEE prior to the design public hearings conflicts with the objectives of § 128, viz., "to afford full opportunity for effective public participation in the consideration of highways . . . design proposals," 23 C.F.R. § 790.1(a), "at those stages of a proposal's development when the flexibility to respond to [participants'] views still exists," *id.* § 790.1(b). *See* H.R. Rep.No.91–1554, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News pp. 5392, 5396:

One further clarification of the two hearing procedure is needed. Since its purpose is to encourage public comment and discussion of the location and design alternatives; [*sic*] obviously a final determination of such matters should not be made until after each of the respective hearings, otherwise the hearings would be a useless formality.

While we cannot say that a previously prepared environmental evaluation may never be used as part of a § 128 study report (because such use may be appropriate if all hearing comments have been anticipated in the evaluation), we caution the defendants that hearing comments are to be taken seriously and that therefore the use of a preexisting environmental evaluation as the sole environmental component of a study report will ordinarily be inadvisable.

growth, land use or the planning process in the Dixon-Kidwell-Davis area, no detailed consideration of the effect industrialization would have on the proposed recreational development along Putah Creek, no estimate of the increased demand for Davis city services which increased population would occasion, no indication that the effects on community cohesion and the tax base have been studied, and no scientifically supported estimate of the effects of industrialization on air and noise pollution or on the quality and sufficiency of Davis' water supply. These and other unanswered questions must be addressed in an EIS/EIR and properly considered at new public hearings before the project may be completed (if that is what is ultimately decided upon).

### 2. *Alternatives and consistency with local urban planning.*

23 C.F.R. § 790.9(b)(1) requires that a design study report include

> [d]escriptions of the alternatives considered and a discussion of the anticipated social, economic, and environmental effects *of the alternatives,* pointing out the significant differences and the reasons supporting the proposed location or design. In addition, the report must include an analysis of the relative consistency of the alternatives with the goals and objectives of any urban plan that has been adopted by the community concerned.

(emphasis added).

The AEE describes three alternatives: (1) construction of a frontage road along the northwest side of the I–80 right of way from a point near Putah Creek to the Pedrick Road Interchange; (2) construction of the project as currently planned except without exit and entry ramps; and (3) abandonment of plans for the interchange and all frontage roads. A fourth alternative, construction of a "tight diamond" interchange that would provide access and accommodate the asserted need for a "farm crossing" but which would not be suitable for in-

dustrial traffic, was suggested at the public hearings and discussed in the DSR.

But neither the AEE nor the DSR contains any discussion of the respective social, economic and environmental effects of these alternatives or their relative consistency with the urban planning of either Davis or Dixon. Aside from the mere descriptions of the four alternatives, the only discussion is directed at establishing that each alternative would be unworkable because of excessive economic cost. The source of the cost estimates upon which this conclusion is based is not specified, and the estimates are not presented in a manner conducive to comparison or analysis.

 We reject the notion that considerations of economic cost, however weighty, suffice to release CDHW from its obligation to discuss the social, economic, environmental and planning impacts in the DSR. The 1968 and 1970 amendments to § 128 which require, respectively, consideration of social, economic, environmental and planning impacts and the submission of a report indicating the nature of the consideration of these impacts clearly show congressional sentiment that the decisionmaking calculus with respect to federal-aid highway projects should not be limited to economic factors. *See generally, Lathan v. Brinegar, supra,* 506 F.2d at 688–89.

██ A properly drafted DSR should allow FHWA, which has the final say on commitment of federal funds, and for whose benefit the DSR is prepared, to compare the project as planned and the alternatives not only on the scale of economic costs and benefits but also with respect to social, economic and environmental impacts and consistency with local planning. It is not for us to say what weight FHWA or state highway departments should, in particular cases, accord to these often conflicting considerations, but when a DSR entirely omits analysis of the social, environmental and planning effects of alternatives, a crucial

element in the congressionally mandated decisionmaking calculus is lacking, and the "consideration" which the statute and regulations contemplate cannot take place.

The DSR and AEE also fail to take into proper account the effect of the project as proposed on Davis' urban planning. Davis submitted hundreds of pages of its planning documents and they have been included as a separate volume of the hearing transcript. But neither the DSR nor the AEE makes even a single reference to the contents of these documents. The Kidwell's project's consistency with the urban planning of Dixon and Solano County does not relieve the defendants of their obligation to consider the project's consistency with Davis' urban planning and to disclose in the DSR the nature and extent of any conflict.

### V. Conclusion.

█ The lengthy record in this case shows, as a matter of law, that the defendants have failed to respond to the requirements of NEPA, CEQA and § 128 of the Federal-Aid Highway Act. The procedures specified in these enactments were not meant to be perfunctory formalities. Accordingly, we reinstate the district court's original injunction against further work on the Kidwell project and remand with instructions to maintain it in effect until such time as an EIS/EIR complying with NEPA and CEQA has been prepared and a new § 128 public hearing or hearings have been held in a manner consistent with this opinion, and for such further proceedings as may be appropriate.