**BORDER POWER PLANT WORKING GROUP, Plaintiff,**

v.

**DEPARTMENT OF ENERGY; Spencer Abraham, in his official capacity; Carl Michael Smith, in his official capacity; Anthony J. Como, in his official capacity; Bureau of Land Management, Defendants.**

No. 02–CV–513–IEG.

United States District Court, S.D. California.

May 2, 2003.

998

Julia A. Olson, Wild Earth Advocates, Eugene, OR, Eric J. Murdock, Hunton and Williams, Washington, DC, for Plaintiff.

Andrew A. Smith, U.S. Department of Justice, Environment and Natural Resources, Albuquerque, NM, U.S. Attorney CV, U.S. Attorneys Office Southern District of California, Civil Division, San Diego, CA, Brian C. Toth, United States Department of Justice Environment and Natural Resources Div., Washington, DC, for Defendants.

Amy G. Nefouse, Latham and Watkins, San Diego, CA, Janice M. Schneider, Latham and Watkins, Washington, DC, for Intervenor–Defendant.

Andrea A. Matarazzo, Remy Thomas and Moose, Sacramento, CA, for Amicus.

Amy G. Nefouse, Latham and Watkins, San Diego, CA, Janice M. Schneider, Latham and Watkins, Washington, DC, for Movant.

Carey L. Cooper, Klinedinst Fliehman and McKillop, San Diego, CA, for Intervenor.

**ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; (3) DENYING DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S DECLARATIONS; (4) DENYING DEFENDANTS' ORAL MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD; (5) GRANTING PLAINTIFF'S MOTION TO STRIKE SUPPLEMENTAL DECLARATION AND REQUEST FOR JUDICIAL NOTICE; and (6) SETTING BRIEFING SCHEDULE FOR THE REMEDY PHASE OF THE MOTIONS FOR SUMMARY JUDGMENT**

GONZALEZ, District Judge.

Presently before the Court are cross-motions for summary judgement, federal

defendants' motion to strike plaintiff's declarations, defendants' oral motion to supplement the record, and plaintiff Border Power Plant Working Group's motion to strike amicus Termoelectrica U.S.'s request for judicial notice and supplemental declaration. For the reasons discussed below, the Court denies in part and grants in part both motions for summary judgment, denies federal defendants' motions to strike and to supplement the record, and grants plaintiff's motion to strike.

## BACKGROUND

### I. Factual Background[1]

This case involves two applications for Presidential Permits and federal rights-of-way to build electricity transmission lines within the United States and across the United States–Mexico border to connect new power plants in Mexico with the power grid in Southern California.

#### 1. The BCP Permit and Right–of–Way

In February 2001, Baja California Power ("BCP"), a wholly-owned subsidiary of Intergen Aztec Energy ("Intergen"), applied to defendant U.S. Department of Energy ("DOE") for a Presidential Permit to construct and operate an electric power transmission line across the international border between the United States and Mexico near El Centro, California. (See Pla's Statement of Undisputed Facts ("PSUF") at ¶ 1; Defs' Statement of Undisputed Facts ("DSUF") at ¶ 2.)[2] In particular, the BCP transmission line will connect the Imperial Valley electric substation in Imperial County, California to a new power plant called the La Rosita Power Complex ("LRPC") under construction just west of Mexicali, Mexico. See DOE–33, 202165–202167, DOE–101, 204344.[3] The connection will be made via another transmission line being constructed in Mexico by Energia de Baja California ("EBC"), a wholly-owned subsidiary of Intergen. See DOE–101 at 204320; DOE–33 at 202167; PSUF at ¶ 2. The LRPC is being built by EBC and another wholly-owned subsidiary of Intergen, Energia Azteca X ("EAX"). DOE–33 at 202167; PSUF at ¶ 2. The LRPC will house four gas-fired combustion turbines. DOE–101 at 204320. EBC will own one of these turbines and EAX will own the remaining three. Id. Two of the EAX turbines, with a combined output of approximately 500 megawatts ("MW"), will provide power to Mexico, while the third EAX turbine and the single EBC turbine will export a combined, nominal[4] 560 MW of power to the United States. DOE–101 at 204320, 204402, 204404. However, the BCP transmission line will be able to transport power

---

1. The administrative record ("AR" or "record") is a compilation of documents relied upon by the agencies in making their challenged decisions and sets forth the material facts in this case.

2. BCP also applied to the Bureau of Land Management ("BLM") for a right-of-way across federal land to build the transmission line. Although the Presidential Permits at issue were issued by the DOE and the rights-of-way were issued by the BLM, both agencies relied upon the same environmental analysis documents. Additionally, the parties focused their briefing almost entirely on the DOE's issuance of the Presidential Permits. For convenience, the Court will follow suit and refer primarily to the DOE permits, although the Court's analysis applies to both agencies' decisions.

3. The Court will cite to the Administrative Record by referring to either the DOE or Bureau of Land Management ("BLM") document number and then to a bates number.

4. The parties explained at oral argument that "nominal" power output refers to the output of a plant when just the primary cycle of the plant is operating. Because these turbines are combined-cycle, they apparently achieve a "maximum" power output by using their secondary cycle.

generated by any of the turbines at the LRPC. DOE–101 at 204320 n. 2 (noting that while exported power may in limited circumstances from one of the two turbines designated for Mexican energy production, the total amount of power exported would not rise above a nominal 560 MW). Each of the double circuit lines proposed by BCP would have a capacity of 600 MW. DOE–033 at 202168. The lines are to be constructed in two phases, with the second circuit only strung when business or economic circumstances make possible the expansion of the EBC facility, or to meet the additional transmission needs of the EAX turbines. *Id.* at 202167–212168.

The EBC turbine and the EAX export turbine utilize dry low-NOx (oxides of nitrogen) combustor technology and selective catalytic reduction ("SCR") technology that reduce NOx emissions to 4 parts per million ("ppm"). DOE–101 at 204402, 204404. Carbon Monoxide (CO) emissions from the EBC turbine and the EAX export turbine would be not be controlled and would emit at 30 ppm. DOE–101, 204404, 204321, 204344. Annual emissions from the EBC turbine and the EAX export turbine would be 282 tons of $NO_2$ (nitrogen dioxide), 924 tons of CO, and 410 tons of PM–10 (particulate matter less than 10 microns in size). DOE–101 at 204401.

The administrative record does not suggest that the remaining two EAX turbines at the LRPC will be built with emissions control technology for NOx or CO. DOE–101 at 204321, 204344.[5] Accordingly, these turbines will emit at 25 ppm for Nox and 30 ppm for CO. DOE–101, 204321. Annual emissions from these two EAX turbines would be 1,502 tons of $NO_2$, 957 tons of CO, and 314 tons of PM–10. DOE–101 at 204401.

## 2. The Termoelectrica–US ("T–US") Permit and Right–of–Way

On March 1, 2001, Sempra Energy Resources (SER) filed an application for a Presidential permit to construct and operate a separate transmission line that would facilitate the transmission of electricity across the U.S.-Mexico border. *See* DOE–35 at 202186–202187. In particular, the SER application sought permission to build a line that would connect the Imperial Valley electric substation to the Termoelectrica de Mexicali ("TDM") power plant under construction near Mexicali, Mexico. DOE–35 at 202186–202187. The connection will be made via another transmission line being constructed in Mexico by TDM. DOE–35 at 202187. TDM is a wholly-owned subsidiary of Sempra Energy. DOE–35 at 202188. The TDM plant would export 100 percent of its net generating capacity to the United States. DOE–101 at 204344. The TDM facility consists of two gas-fired combustion turbines. DOE–101 at 204320. Although the TDM facility is only permitted by Mexican authorities to generate a nominal 500 MW, DOE–35 at 202188,[6] SER indicated that it intended the possible second circuit of the transmission line to have the potential to export up to another nominal 500 MW. DOE–36 at 202196; DOE–35 at 202188.

The TDM facility would be equipped with emission control technology, including

---

**5.** Defendants argue that Intergen has announced since the issuance of the Presidential Permits that all of the Intergen turbines will use emissions control technology for NOx. (*See* DSUF at ¶ 23). However, based on defendants own arguments in their motion to strike, the Court will focus on the information available in the record as it stood at the time that defendants made the finding of no significant impact.

**6.** The AR also indicates, however, that TDM is intended to export 600 MW to the U.S. DOE–101, 204321.

dry low-NOx combustor technology, SCR, and oxidizing catalyst systems, to reduce Nox and CO emissions. DOE–101 at 204402. The TDM facility would thus emit 2.5 ppm for NOx and 4.0 ppm for CO. DOE–101 at 204402, 204321. Based on 600 MW of energy output, the TDM facility would annually emit 170 tons of NOx, 165 tons of CO, and 216 tons of PM–10. DOE–101 at 204401.

Concentrations of pollutants at the U.S. Mexico border due to emissions from the TDM facility are predicted to increase as follows: NOx (annual) 0.09 $\mu g/m^3$; CO (8–hour) 2.16 $\mu g/m^3$; PM–10 (hourly) 1.12 $Sg/m^3$; PM–10 (annual) 0.11 $\mu g/m^3$. DOE–101 at 204403. When combined with total emissions predicted from the entire LRPC, the concentrations of pollutants at the U.S./Mexico border are expected to rise as follows: NO2 (annual) 0.8 $\mu g/m^3$; CO (1–hour) 70.0 $\mu g/m^3$; CO (8–hour) 30.8 $Sg/m^3$; PM–10 (24–hour) 4.5 $\mu g/m^3$; PM–10 (annual) 0.3 $\mu g/m^3$. DOE–101 at 204439.

## II. Procedural Background

After undertaking an environmental assessment of the applications for the Presidential Permits and the BLM rights-of-way, DOE and BLM each issued a Finding of No Significant Impact ("FONSI") in December 2001. DOE–103; BLM–182 (FONSI for BCP right-of-way); BLM–183 (FONSI for SER right-of-way). DOE issued Presidential Permits to BCP and SER on December 5, 2001. DOE–104 at 204612; DOE–105 at 204618. BLM granted a right-of-way to BCP that became effective on December 28, 2001, and another right-of-way to SER that became effective on December 31, 2001. BLM–189 at 102333; BLM–186 at 102290. The Presidential Permit and the right-of-way issued to SER were subsequently transferred to T–US, a subsidiary of Sempra Energy. DOE–125S at S24897; BLM–207S at S102612.

Plaintiff filed a motion for summary judgment, alleging various violations of the National Environmental Protection Act ("NEPA") and the Administrative Procedure Act ("APA") on January 31, 2003. The federal defendants filed a cross-motion for summary judgment and an opposition to plaintiff's motion on March 13, 2003. Amicus curiae briefs were filed by BCP, T–US, and Imperial County and City of El Centro. Plaintiff responded to the BCP and T–US briefs on April 4, 2003, and both plaintiff and the federal defendants replied to the other's opposition brief. The federal defendants have also moved separately to strike extra-record materials. Finally, plaintiff's moved to strike T–US's request for judicial notice and supplemental declaration.

## DISCUSSION

### III. Preliminary Issues

Before reaching the merits of the case, the Court must first determine whether it has jurisdiction and what evidence it can consider. First, the Court will briefly consider whether it has proper jurisdiction.

#### A. Standing

■ Although defendants do not challenge plaintiff's standing, the Court has an independent duty to assure itself that it has jurisdiction over the case. Plaintiff has submitted several declarations to demonstrate its standing.

##### 1. Legal Standards

##### a. Traditional Standing

■ Because standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," the Court does not have jurisdiction in its absence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The "irreducible constitutional

1009 appears at top right.

minimum" of standing contains three elements. *Id.* First, the plaintiff must have suffered an "injury in fact." *Id.* The Supreme Court's opinions have defined such an injury as "an invasion of a legally protected interest which is (a) concrete and particularized...and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations omitted). Second, the injury must be fairly traceable to the challenged action of the defendants. *See id.* Third, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. 2130 (internal quotations omitted). Each of these elements must be supported by the plaintiff with the same manner and degree of evidence required to show any other matter at the present stage of the litigation. *Id.*

With regard to the "imminence" of the injury in fact, the plaintiff must show that the injury is *"certainly* impending." *Id.* at 564 n. 2, 112 S.Ct. 2130 (emphasis in original). The goal is to avoid conferring standing on a party on which no injury would have occurred at all in the absence of judicial action. *Id.* In the end analysis, the Court warns that standing "is not 'an ingenious academic exercise in the conceivable.'" *Id.* at 566, 112 S.Ct. 2130 (citing *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

The requirement that the injury is particularized means that "[t]he plaintiff must have a personal stake in the outcome." *Id.* at 583, 112 S.Ct. 2130. To be concrete, the injury must be more than "abstract." *Id.* Rather, plaintiff must demonstrate that it has "sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *Id.* (internal quotation omitted).

### b. Procedural Standing

In *Lujan v. Defenders of Wildlife,* the Court recognized that its analysis would differ if it was faced with a case in which "plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (*e.g.,* . . . the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them)." *Id.* at 572, 112 S.Ct. 2130. Although the Court rejected the argument that the injury-in-fact requirement is satisfied by "congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law," *id.* (emphasis in original), it also recognized that "procedural rights" are special and should be accorded different treatment under the standing analysis:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.* at 572 n. 7, 112 S.Ct. 2130. The *Lujan* Court explained that the case before it differed from its hypothetical case because the *Lujan* plaintiffs sought procedural standing for persons who had no concrete interests affected. *Id.* In terms of the Court's hypothetical, these would be people who live on the other side of the coun-

try from where the proposed dam would be built. *Id.* In sum, the Court held that an individual can enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573, 112 S.Ct. 2130.

The Ninth Circuit has determined that the *Lujan* case requires a plaintiff to show two essential elements for procedural standing: "(1) that he or she is a person who has been accorded a procedural right to protect [his or her] concrete interests... and (2) that the plaintiff has some threatened concrete interest ... that is the ultimate basis of [his or her] standing." *Douglas County v. Babbitt,* 48 F.3d 1495, 1500 (9th Cir.1995) (internal citations omitted). Additionally, "plaintiffs must show that their interest falls within the 'zone of interests' that the challenged statute is designed to protect." *Id.* at 1500–01.

The Ninth Circuit has found in several cases that a procedural injury can form the basis for standing. *See, e.g. Pacific Northwest Generating Coop. v. Brown,* 25 F.3d 1443, 1450 (9th Cir.1994) (plaintiffs with an economic interest in preserving salmon have procedural interest in ensuring that the ESA is followed); *Friends of the Earth v. United States Navy,* 841 F.2d 927, 931–32 (9th Cir.1988) (residents who live near site of proposed port have procedural standing to sue for Navy's alleged failure to follow permitting regulations); *State of California v. Block,* 690 F.2d 753, 776 (9th Cir.1982) (state of California has procedural standing to challenge the adequacy of an EIS for forest service's land allocation); *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975) (city located near proposed freeway interchange has procedural standing to challenge agency's failure to prepare an EIS).

### c. Organizational Standing

■ An association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

### 2. Application to This Case

■ Plaintiff claims that five of the eight declarations it submitted in conjunction with its motion for summary judgment support plaintiff's standing. (*See* Declarations of Marie Barrett, Carlos Yruretagoyena Ugalde, Fernando Armando Medina–Robles, Kimberly Collins, and William Powers). All five are members of the plaintiff organization. Four of the five live either in Imperial County, U.S.A., or Mexicali, Mexico, near the transmission lines and power plants at issue. Based on their proximity to the project and the procedural requirement under NEPA to evaluate whether the project will have a significant impact on the environment, it seems clear that at least four of the members submitting declarations have procedural standing to sue in their own right. Furthermore the interest that the plaintiff seeks to protect—the public health and quality of the environment in that region—are germane to the plaintiff's purpose. (*See* Powers Decl. at 2) ("[Plaintiff organization's] membership is composed of United States and Mexican citizens who share a concern for the environmental health of the border region."). Finally, because the standing to sue is common to at least four of the members who submitted declaration, it is clear that no one member's participation is

required in the lawsuit other than to supply the declaration that confers standing. Accordingly, it appears that plaintiff has satisfactorily demonstrated by a preponderance of the evidence that it has organizational standing to proceed in this suit.

### B. Extra–Record Materials

As a second preliminary matter, the Court must determine what facts may properly form the basis of its decision. Plaintiff's cause of action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. In general, actions under the APA are based on judicial review of the administrative record on which the agency relied in reaching the decision at issue. See 5 U.S.C. § 706. Defendants complain that plaintiff has filed eight extra-record declarations, each of which postdates the final decision made by defendants in this case. (See generally Defs' Mem. in support of Motion to Strike). Accordingly, defendants move to strike these declarations. At the same time, Defendant–Intervenors T–US and BCP have submitted extra-record declarations in support of their respective amicus briefs. Finally, amici County of Imperial and City of El Centro have lodged several documents that they believe require judicial notice.[7]

The APA directs that "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The Ninth Circuit has interpreted this command in the following way:

> Generally, judicial review of agency action is limited to review of the administrative record. Friends of the Earth v. Hintz, 800 F.2d 822, 828 (9th Cir.1986). In Florida Power & Light Co. v. Lorion, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), the Supreme Court empha-

sized that when reviewing administrative decisions:

> "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court. Id. at 743–44, 105 S.Ct. at 1607 (quoting Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). This standard is applicable to review of agency action under NEPA. Hintz, 800 F.2d at 829.

However, certain circumstances may justify expanding review beyond the record or permitting discovery. See, e.g., Public Power Council v. Johnson, 674 F.2d 791, 793 (9th Cir.1982). The district court may inquire outside the administrative record when necessary to explain the agency's action. Id. at 793–94. When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision. Hintz, 800 F.2d at 829.

The district court may also inquire outside of the administrative record "when it appears the agency has relied on documents or materials not included in the record." Public Power Council [v.

---

7. The Court discusses T–US's supplemental declaration and request for judicial notice separately to provide a fuller context for that discussion. See Section VI(A), infra.

*Johnson]*, 674 F.2d [791] at 794 [9th Cir.1982]. In addition, discovery may be permitted if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action. *Id.* *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988) *as amended by Animal Defense Council v. Hodel*, 867 F.2d 1244 (9th Cir.1989); *see also Hells Canyon Preservation Council v. Jacoby*, 9 F.Supp.2d 1216, 1223 (D.Or.1998).

 Plaintiff argues that its three scientific declarations fall within these exceptions. (*See* Pla's Opp'n to Defs' Mot. to Strike at 3).[8] First, plaintiff argues that the declarations demonstrate relevant factors (including impacts on air, water, and human health) that DOE did not adequately consider. (*Id.*). Second, they argue that the declarations help to explain technical terms essential to the case. (*Id.* at 4). Because it is not the Court's job to "resolve disagreements among various scientists as to methodology," the Court will not consider the declarations to the extent they seek to simply advocate a better or different methodology for assessing environmental impacts already analyzed in a reasonable manner by defendants. *See Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985). Neither may post-decisional documents be used to object to or support the federal actions for the first time. *See Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir.1991); *Association of Pacific Fisheries v. EPA*, 615 F.2d 794, 811–812 (9th Cir. 1980). However, to the limited extent that these declarations provide information falling within one of the established exceptions to the general rule that the review will be confined to the record, the Court will consider them. *See Sierra Club v.*

*Babbitt*, 69 F.Supp.2d 1202, 1209 (E.D.Cal. 1999) (finding extra-record declarations permissible and helpful in understanding the factual complexities of the case). If the Court relies on any of these extra-record documents, it will provide a citation to that document and explain the exception under which it considers the document. The Court will treat the extra-record materials submitted by the amici in the same manner. Accordingly, the Court declines to adopt the bright line rule urged by defendants, and denies their motion to strike plaintiff's extra-record declarations.

## IV. Threshold Question: Are the Power Plants Within the Scope of the NEPA Review?

As a threshold matter, the Court must first determine the scope of the environmental review required by NEPA to determine whether the construction of the power plants is within that scope. Plaintiff assumes in its arguments that the actions whose impacts must be analyzed include not only the construction and operation of the actual transmission lines, but also the operation of the power plants in Mexico to which the lines will be connected. In fact, all, or at least the vast majority, of the complaints of impacts to air quality, water quality, and human health set forth by plaintiff are actually caused by the power plants. (*See generally* Pla's Mem. at 1:21–28). Because of this, amicus BCP argues that if the "action" at issue here is narrowly limited to the construction and operation of the transmission lines, without regard to the generation of the power, and the emissions of the power plants are not "effects" of that action, then plaintiff's complaints are immaterial to the permits at issue.

---

**8.** Plaintiff argues that the remaining five declarations are submitted only to preemptively demonstrate standing. The Court finds that this is a permissible use of these five declarations and will consider them only to the extent that they bear on plaintiff's standing.

NEPA requires a federal agency to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Council for Environmental Quality (CEQ), which is charged with implementing NEPA, has defined a "major federal action" as including "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Similarly, defendant Department of Energy has defined "action" for NEPA purposes as "a project, plan, or policy ... that is subject to DOE's control and responsibility." 10 C.F.R. § 1021.104(b). BCP argues that the latter definition necessarily excludes the Mexican power plants from the scope of the action because these plants are outside the regulatory jurisdiction of the United States. (*See* BCP Brf. at 6).

The first key question under the regulatory definitions is whether the plants will be "projects" that are "subject to [Federal] control and responsibility." 10 C.F.R. § 1021.104(b). Clearly, they are not because they are outside the jurisdiction of the United States. Accordingly, defendants correctly did not include the power plants themselves when defining the scope of the proposed action. DOE–101 at 204328.

Nonetheless, the environmental analysis of the actions might still require consideration of the operation of the power plants if such operation constitutes an "adverse environmental effect" of the granting of the permit to construct and operate the transmission lines. 42 U.S.C. § 4332(C)(ii). NEPA's implementing regulations define "effects" and categorize them as "direct" or "indirect." 40 C.F.R. § 1508.8(a). "Direct effects" are those "which are caused by the action and occur at the same time and place." *Id.* "Indirect

effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* Thus, as BCP notes, the question is one of causation. (BCP Brf. at 6).

■■■ The question of whether the power plants are effects of the proposed action is central to assessing both the legality of the FONSI and to assessing the adequacy of the environmental assessment (EA). First, in deciding whether to prepare an EIS, an agency must consider "significant indirect effects." *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir.1989). Second, the question of the adequacy of the EA's analysis of the air impacts, water impacts, and alternatives of the proposed actions, depend on whether the plants' adverse environmental impacts are effects of the proposed transmission lines.

The *Sylvester* court created the following analogy to address the scope of "effects" of a proposed action that must be discussed in environmental analyses:

> Environmental impacts are in some respects like ripples following the casting of a stone in a pool. The simile is beguiling but useless as a standard. So employed it suggests that the entire pool must be considered each time a substance heavier than a hair lands upon its surface. This is not a practical guide. A better image is that of scattered bits of a broken chain, some segments of which contain numerous links, while others have only one or two. Each segment stands alone, but each link within each segment does not.

*Id.* at 400. Employing this analogy, the *Sylvester* court held that in order for an agency to be required to consider secondary (indirect) and cumulative impacts (or effects) of an action other than the proposed action under NEPA, the proposed

action and the second action must be "two links of a single chain." *Id.* In so holding, the *Sylvester* court collected and analyzed the prior cases discussing the question in the Ninth Circuit. *Id.* (citing *Port of Astoria, Oregon v. Hodel,* 595 F.2d 467, 480 (9th Cir.1979) (agency's EIS had to consider the supply of federal power and the construction of a private magnesium plant that used the power); *Thomas v. Peterson,* 753 F.2d 754, 761 (9th Cir.1985) (agency's EIS had to consider both a federal road and the federal timber sales that the road would facilitate); and *Colorado River Indian Tribes v. Marsh,* 605 F.Supp. 1425, 1433 (C.D.Cal.1985) (agency had to prepare an EIS that considered both the federal action of stabilizing a river bank and the private housing built as a result)); *see also id.* at 401 (citing *Friends of the Earth v. Hintz,* 800 F.2d 822, 832 (9th Cir.1986) (agency considered only filled wetlands and not other aspects of a harbor facility in deciding not to prepare an EIS); *Enos v. Marsh,* 769 F.2d 1363, 1371–72 (9th Cir.1985) (agency's EIS did not have to consider non-federal shore facilities for a new deep draft harbor); *Friends of Earth, Inc. v. Coleman,* 518 F.2d 323, 328 (9th Cir.1975) (agency did not have to prepare an EIS for state funded projects in a partially federally funded airport development)). The court concluded that these cases did not mandate a different result because "[t]he federal and private portions of the projects considered in these cases were joined to each other (links in the same bit of chain) in a way that the golf course [the proposed action under consideration in *Sylvester* ] and the remainder of the resort complex (a separate segment of chain) are not." *Id.*

Importantly, the basis for the *Sylvester* court's determination of whether two related actions constituted links of a single chain involved determining whether "each [action] could exist without the other." *Id.* It was not enough that the actions might

be related or that each "might benefit from the other's presence." *Id.* Accordingly, the question in the present case narrows to whether the transmission lines and the power plants at issue would exist in the absence of the other.

Somewhat confusingly, the *Sylvester* court cites two other Ninth Circuit cases in a footnote, dismissing them because they involved "the impact of federal action rather than the scope of federal action." *Id.* at 401 n. 3 (citing *Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810, 816 (9th Cir.1987) and *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975)). While it is clear, as the *Sylvester* court implies, that the scope of the proposed action and the impacts of that action are separate questions under NEPA, this appears confusing only because "scope" may also refer to the variety of impacts that a sufficient EA or EIS must address. It is helpful to differentiate then between the *scope of the proposed action* and *scope of the NEPA review.* Thus, in the present case, the proposed action does not include the operation of the Mexican power plants. The question remains, however, whether the operation and emissions of those plants must be included within the scope of the NEPA review because they are effects of the proposed federal action. It seems to the Court that many of the cases cited by *Sylvester* court involved both the impact (or effects) of a proposed federal action and the scope of the action. While those cases treated the two concepts as coextensive, this Court finds the cases relevant to the present inquiry only to the extent that they discuss the effects of the proposed action. Thus, the two additional cases cited by *Sylvester* dealing exclusively with the effects of federal action are central to the present analysis.

First, in *Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810, 816 –817 (9th Cir.1987), *rev'd on other*

*grounds, Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), the court first emphasized that NEPA does not recognize any distinction between primary and secondary effects when requiring environmental review of the effects. *Id.* at 816. In discussing how proximate any effects must be to the proposed action to require their inclusion in the NEPA analysis, the Court held:

> This court would not require the government to speculate on impacts in order to "foresee the unforeseeable". *See City of Davis v. Coleman,* 521 F.2d 661, 676 (9th Cir.1975). However, [i]t must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry". *Id.* at 676 (quoting *Scientists' Institute for Public Information v. A.E.C.,* 481 F.2d 1079, 1092 (D.C.Cir. 1973)). Thus we find it imperative that the [agency] evaluate the reasonably foreseeable significant effects which would be proximately caused by implementation of the proposed action.

*Id.* at 816–817. Similarly, though perhaps more narrowly, the court in *City of Davis v. Coleman,* found that effects must be included in the environmental review when the action is an "indispensible prerequisite" or an "essential catalyst" to the effects. 521 F.2d 661, 674 (9th Cir.1975).

More recently, the Ninth Circuit reaffirmed that an agency may "limit the scope of its NEPA review to the activities specifically authorized by the federal action where the private and federal portions of the project could exist independently of each other." *Wetlands Action Network v. U.S. Army Corps of Engineers* (WAN), 222 F.3d 1105, 1116 (9th Cir.2000). In general that Court instructed that "deciding whether federal and non-federal activity are sufficiently interrelated to constitute a single federal action for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship." *Id.* (internal quotations omitted).[9]

The *WAN* court faced a situation, like here, where the federal agency did not have independent jurisdiction over the non-federal action that was a potential effect of the proposed action. *See id.* at 1117.[10] Furthermore, the court found that the non-federal action "certainly *could* proceed without the [federal action] and . . . is currently proceeding without the [federal action]." *Id.* The non-federal action at issue in WAN, as here, was not financed

**9.** Although the *WAN* court describes the federal and non-federal activity as a "single federal action for NEPA purposes," this Court's understanding of the holding is not that the private activity may fall within the scope of the proposed action, but rather that the private activity might constitute an effect of the proposed action and therefore fall within the scope of NEPA review.

**10.** For this reason, cases involving whether the impact of "connected actions" have to be considered together under NEPA are inapposite to the case at bar. *Cf. Save the Yaak*

*Committee v. Block,* 840 F.2d 714, 719 (9th Cir.1988) (analyzing whether separate federal actions involving logging operations must be considered cumulatively under NEPA regulations governing "connected actions"); *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir. 1985) (same). The EA concluded that a Federal Energy Regulatory Commission action involving a gas pipeline to fuel the plants under discussion was not a "connected action" pursuant to NEPA regulations. *See* DOE–101 at 204444–45. Plaintiff does not challenge that conclusion in the present action.

by federal funding, and federal regulations did not control the design of the non-federal action. *Id.* Finally, the *WAN* court derived comfort from the fact that the non-federal action had already been subjected to extensive state environmental review. *Id.*

▮ In sum, Ninth Circuit precedent makes clear that effects must be causally linked to the proposed federal action in order for NEPA to require consideration of those effects in an EA or EIS. In the present case, only BCP puts much weight on the argument that the power plant emissions are not effects of the transmission line project. BCP's principle argument is that the power transmission lines are not a but-for cause of the LRPC emissions because the LRPC would generate some of its power for the Mexican market without regard to whether the transmission lines are completed, and it could send its export power through the Mexican power grid to the United States via an alternative transmission line. (*See* BCP Brf. at 9–10). Amicus T–US does not make the same argument, presumably because the TDM plant will only be producing power for export to the United States, and the only planned transmission line connecting that plant is the one requiring the permit under consideration. The federal defendants appear to concede, both in the EA itself and their briefs, that they were required to analyze to some extent the impacts of the power plants,[11] although they argue, correctly, that the power plants are not within the scope of the proposed action.

▮ Plaintiff argues that the BCP and T–US permits should not be separately analyzed because the federal defendants opted to analyze the actions together. (*See* Pla's Reply at 10, n. 10). Especially given the *WAN* court's instruction that the determination of effects is a fact-specific inquiry, the Court finds no reason why it should not consider the permits separately. This is even more important in this case because the record demonstrates that at least part of the LRPC plant is dedicated to providing power exclusively to the Mexican market, while all of the power of the TDM plant will be exported to the United States. Given these different factual circumstances, the Court finds it appropriate to consider the permits separately at the threshold level of analysis.

▮ The LRPC plant is divided into three EAX turbines and one EBC turbine. Two of the EAX turbines are designed to produce power exclusively for sale to a Mexican utility, and it is reasonably foreseeable that very little of this power will flow through the BCP transmission line into the United States. DOE–101 at 204320. The EA does acknowledge the possibility that under limited circumstances, the domestic generation turbines may provide power to the BCP line. *Id.* at 204320, n. 2. The record shows that the third EAX turbine is anticipated to produce power exclusively for export to the United States. *Id.* at 204320, n. 1. However, the power produced by the EAX export turbine could be transmitted to the United States through an alternative interconnection site. *Id.* at 204328–29, 204395.[12] Fi-

---

11. *See* Defs' Reply at 1:15–17 ("DOE reasonably assessed the potential impacts of the actual proposed action and alternatives, and *also* reviewed impacts from the associated power plants."). This language suggests that federal defendants view the power plant impacts as secondary effects under NEPA. However, federal defendants also argue that NEPA

does not require them to consider alternatives to the power plants, or to consider the cumulative impacts of the plants beyond that analysis contained in the EA. (Defs' Reply at 1:17–19).

12. Presumably, the Presidential Permit governing the alternative interconnection site

nally, the EBC turbine is configured and licensed only to sell electricity over the BCP line. *Id.* at 204328–29, 204395, 204321; BCP Brf. at 9.

■ Although BCP cites to an extra-record declaration to support its claim that the two export turbines at the LRPC plant could be reconfigured to provide power for the Mexican market in the absence of the BCP transmission line, the Court finds that these extra-record materials were not before the agencies at the time that they made the challenged decisions and do not fall within any exceptions to the rule that the Court will limit its review to the record. Considering only the information that the federal defendants had before them at the time they made their final decisions, the Court finds that it was reasonably foreseeable that the two export turbines in the LRPC would use the BCP transmission line to export the entirety of their power. Furthermore, given that the BCP line is the only current means evidenced by the record through which the EBC turbine could transmit its power, the Court finds that the BCP line was a but-for cause of the generation of power at the EBC turbine. Because the EBC turbine and the BCP transmission line are two links in the same chain, the emissions resulting from the operation of the EBC turbine are "effects" of the BCP transmission line that must be analyzed under NEPA. For the same reasons, the Court finds that the operation of the TDM plant is an effect of the T–US transmission line. *See* DOE–101 at 204321 (indicating that the only current means of transmission from the TDM plants are through the T–US line).

Conversely, the Court finds that the two turbines in the LRPC dedicated almost exclusively to the generation of power for the Mexican market are not causally linked to the BCP line in a way that makes the BCP line a necessary prerequisite or essential catalyst to their operation. Because the line of causation is too attenuated between these turbines and the federal action permitting the BCP line, Ninth Circuit authority makes clear that the emissions of the non-export turbines were not effects of the BCP line and that the federal defendants were therefore under no NEPA obligation to analyze their emissions as effects of the action.[13] Additionally, because the record makes clear that the EAX export turbine has an alternative to the BCP line to export its power, the BCP line cannot be considered the but-for cause of the EAX export turbine's operation. Indeed, the EA concludes that the EAX export turbine would be built regardless of whether the BCP line is permitted. DOE–101 at 204328–29, 204395. For this reason, the EAX turbine is also not an effect of the action.

■ Although NEPA does not explicitly limit the federal defendants' review of impacts to only those required by NEPA (and, indeed, agencies might be commended for erring on the side of precaution and inclusiveness when considering major actions affecting the environment), the Court does not believe that even an inadequate analysis of isolated impacts that are not effects of the proposed action can require the invalidation of an EA. Accordingly, the Court will not consider plaintiff's complaints regarding the EAX turbines at the

---

would need to be modified and an appropriate environmental review performed in the event that the EAX export turbine was forced to export its power through the alternative line.

13. As discussed in more detail below, however, the EA must still analyze the cumulative impact of the proposed action when considered in conjunction with the impacts of other independent actions in the area.

LRPC except to the extent they relate to the cumulative impact analysis.

## V. Did the Agencies Act Arbitrarily When They Issued a "Finding of No Significant Impact" (FONSI)? [14]

### A. Standard of Review

■ Summary judgment is properly granted when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In an administrative review case, like this one, the administrative record provides the relevant facts, and the legality of the agency's decision based on those facts is a question of law. Accordingly, summary judgment is an appropriate vehicle for resolving a case like the one at bar. See Northwest Motorcycle Assn. v. U.S. Dept. of Ag., 18 F.3d 1468, 1471–72 (9th Cir.1994).

■ Under NEPA, an agency must prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's regulations provide that an agency may prepare an EA to determine whether the proposed action is one that requires a full EIS. 40 C.F.R. § 1501.4(b). The EA must briefly describe the proposal, examine alternatives, consider environmental impacts, and provide a listing of individuals and agencies consulted. 40 C.F.R. § 1508.9. After preparation of the EA, an agency may decide to issue a "finding of no significant impact" (FONSI), which relieves the agency of its obligation to prepare a full EIS. If, however, the EA establishes that the agency's action may have significant environmental impacts, the agency must prepare an EIS. National Parks & Conservation Ass'n v.

Babbitt, 241 F.3d 722, 730 (9th Cir.2001) (internal quotations omitted).

■ An agency's decision not to prepare an EIS under NEPA is a final administrative decision reviewable under the Administrative Procedure Act (APA). See 5 U.S.C. § 701 et seq. Under the APA, the Court must decide whether the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See Native Ecosystems Council v. Dombeck, 304 F.3d 886, 891 (9th Cir.2002). Under this standard, courts must "carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." Public Citizen v. Department of Transp., 316 F.3d 1002, 1020 (9th Cir.2003) (internal quotations omitted). The Court must be satisfied that the agency took a "hard look" at the potential environmental impacts of the proposed action. Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir.1992). Part of this hard look is providing a convincing statement of reasons why potential effects are insignificant, and therefore do not necessitate the preparation of an EIS. See Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir.1988). If the decision of the agency is "well informed and well considered," the Court must defer to the agency's decision. LaFlamme v. FERC, 852 F.2d 389, 398 (9th Cir.1988); see also WAN, 222 F.3d at 1114–1115 (an environmental review under NEPA will only be overturned if the agency committed a clear error in judgment).

### B. Analysis

■ The parties do not dispute in their briefs that the issuance of the Presidential Permits and the rights-of-way in the pres-

---

**14.** Because the Court has requested the parties to brief only the issue of whether the EA and FONSI amount to violations of NEPA, the Court does not now address whether an EIS is required. The Court will address the appropriate remedies for any violations at a later hearing.

ent case represent "major federal actions" as defined by the NEPA regulations. Rather, the dispute centers on whether these actions will have "significant" impacts on the environment. NEPA regulations provide guidance on evaluating the significance of an action's impact. *See* 40 C.F.R. § 1508.27. Those regulations provide as follows:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27. If the agencies' actions are environmentally " 'significant' according to *any* of these criteria," then they erred in failing to prepare an EIS. *Public Citizen v. Department of Transp.,* 316 F.3d 1002, 1023 (9th Cir.2003) (citing *Nat'l Parks,* 241 F.3d at 731) (emphasis in original).

*1. Public Health*

 Plaintiff argues that despite public comments alerting the agencies to poten-

tial impacts on public health as a result of increased air pollution, the EA failed to evaluate these impacts. (*See* Pla's Mem. at 11–12). The Ninth Circuit has stated that even a "marginal degradation" of air quality "could easily be said" to be a significant impact on the environment for NEPA purposes. *Public Citizen v. Department of Transp.*, 316 F.3d 1002, 1024 (9th Cir.2003). In *Public Citizen*, the Court found that an agency's failure to even consider whether NOx and PM–10 emissions from diesel trucks would impact public health was a violation of NEPA. *Id.*

Defendants respond that they did in fact consider the health impacts of increased emissions. The reasoning upon which they rely is based on the following steps of logic: (1) Because they determined that emissions of NOx, CO, and PM–10 would fall below "significance levels" (SLs) established by the EPA, and (2) because these SLs are "based on protecting human health and welfare," then (3) the federal defendants at least implicitly analyzed whether the air emissions would harm public health. (*See* Def's Mem. & Opp'n at 11–12, 34). The EPA sets SLs for criteria pollutants in the context of carrying out its duties under the Clean Air Act. *See* DOE–101 at 204401–204402. These are the levels below which any particular major source is not deemed to be contributing to violations of the National Ambient Air Quality Standards ("NAAQS"). *Id.* The Appendix to the EA states that "[i]f measured or predicted concentrations of the criteria pollutants are below the ambient standard, no health effects are expected." DOE–102 at 204472. This statement contradicts plaintiff's claim that the EA contained no discussion of the health impacts

of the actions whatsoever.[15] (*See* Pla's Reply & Opp'n at 7). Moreover, defendants argue that this link between NAAQS and public health impacts distinguishes the present case from *Public Citizen*. (*See* Defs' Mem. & Opp'n at 35, n. 18). Defendants argue that there exists no "marginal degradation" of air quality, as the term is used in *Public Citizen*, because the EA establishes that emissions would not exceed the SLs. (*Id.*). Finally, defendants argue that further discussion of the potential health impacts of the actions are discussed in the EA appendix, which they argue should be considered to be part of the EA. (*Id.* at 35). The EA Appendix specifies that T–US's application evaluated potential acute, chronic, and cancer health effects resulting from the TDM facility and found them to be "substantially below their relative thresholds of 10 in 1 million, 0.5 and 0.5, respectively." DOE–102 at 204486. Defendants also argue that modeling data for the LRPC export turbines were analyzed to ensure that they would result in no negative health impacts. *Id.* at 204469. Defendants argue that these analyses constitute the hard look they were required to take.

Although plaintiff argues that an analysis of whether air impacts will exceed EPA SLs *cannot* be equated with the public health analysis required by NEPA, the Court finds that plaintiff's argument is merely one involving methodology. The Court will not require that the agencies analyze the air impact on public health in a particular way, but rather will only ensure that the agencies' analysis is well-reasoned. The Court finds that the agencies have met their burden in this case. The

---

**15.** Even if the Court excludes the Appendix to the EA from its review, the Court declines to adopt plaintiff's argument that an analysis of air quality impacts is not simultaneously an analysis of the public health impacts of impaired air quality. Air quality is regulated primarily because poor air quality has been linked to health impacts. Thus, an evaluation of whether the actions affect air quality necessarily involves an evaluation of the health impacts of the actions resulting from air pollution.

logic of their argument is indeed well-reasoned: If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health.[16]

### 2. Uncertainty

▮▮▮▮▮ Plaintiff argues next that an EIS must be prepared because the effect of the Mexican power plants on the formation of ozone in Imperial County's airshed are uncertain. "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential ... effects. The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Public Citizen*, 316 F.3d at 1024 (internal quotations omitted) (omission in original).

In *Public Citizen*, the court held that an EIS was required to resolve uncertainties where an EA had made an arbitrary assumption about data supporting the agency's conclusion. *See id.* at 1026 (FONSI unsupportable because, among other reasons, it made an "an arbitrary assumption about the percentage of newer, 'cleaner' Mexican trucks on the roads"). Plaintiff in the present case argues that defendant's assumption that NOx emissions and ozone production would be linearly related is arbitrary and that therefore ozone modeling should have been conducted. (Pla's Reply & Opp'n at 14–15). In support of its argument, plaintiff points out that the EA itself states that the process of ozone formation is "complex and is also non-linear (i.e., output is not necessarily proportional to input.")." DOE–101 at 204407. On the same page of the EA, the agencies state that ozone in Imperial County, like other rural areas, "does generally tend to be NOx-limited (i.e., adding more NOx increases [ozone] )." *Id.*

Defendants argue that they have acted conservatively in assuming that ozone production would be proportional to NOx emissions. (*See* Defs' Reply at 9). First, they argue that under some circumstances, increased NOx emissions can lead to a *decrease* in ozone. (*Id.*). Second, they argue that even if they took the counter-assumption that ozone was VOC-limited,[17] then additional NOx emissions would have little to no effect on ozone production. (*Id.*). Furthermore, defendant argues that to the extent plaintiff demands the use of ozone modeling to assess impacts, plaintiff merely disagrees with the method chosen by DOE. (*See* Defs' Mem. & Opp'n at 29).

▮▮▮▮ The Court need not resolve disagreements among scientists as to methodology or to decide whether the method

---

16. For the same reason, the Court declines to find that the agencies acted arbitrarily by not considering whether the emissions from the plants would violate the Clean Air Act's "prevention of significant deterioration" requirements (PSD) for attainment areas. First, this is yet another disagreement concerning the methodology of the agency's analysis, rather than an argument concerning the existence or adequacy of such analysis. Second, to the extent this argument attacks the reasonableness of the agencies' analysis, the Court finds that the agencies' decision was not arbitrary because the record shows that Imperial County is a nonattainment area for the emissions in question, and the PSD regulations are meant for areas in attainment or categorized as "unclassifiable." *See* 42 U.S.C. § 7471; DOE–101 at 204364 (Salton Sea Air Basin in nonattainment for PM–10, ozone, and in localized nonattainment for CO).

17. VOCs are volatile organic compounds and are, along with sunlight and NOx, one of the main sources of "fuel" for the production of ozone. DOE–101 at 204407. The production of ozone tends to be limited either by the availability of VOCs or by NOx. *Id.*

employed by an agency in its analysis is the best available. *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). Instead, the Court's task "is simply to ensure that the procedure followed by the [agencies] resulted in a reasoned analysis of the evidence before it, and that the Service made the evidence available to all concerned." *Id.* Here, defendants present a reasoned analysis of the impacts on ozone. They provide a logical argument that the presence of NOx and ozone will be closely and positively correlated. DOE–101 at 204407. They then analyzed the contributions of all turbines at issue to the concentration of NOx at the U.S. border and reasonably extrapolated from this the impact on ozone. *Id.* at 204407–08. The criticism leveled by plaintiff is not at the amount of data collected to determine NOx levels at the border, but rather at the methodology employed to estimate ozone impacts. NEPA does not provide the Court with authority, however, to disagree with the agencies' specialized knowledge and determination that the particular methodology urged by plaintiffs would be infeasible and inaccurate. *See* DOE–101 at 204408 (describing the limited utility of ozone modeling when applied to the projects at issue). Accordingly, the Court does not find that the agencies acted arbitrarily in issuing the FONSIs because of uncertainty.

### 3. Impact on the Salton Sea, an Ecologically Critical Area

Although the draft EA contained no analysis of the impacts of the action on the Salton Sea, in response to public comments the agencies analyzed the impacts in the final EA and the FONSI. *See* DOE– 101 at 204446, 204431–204432; DOE–103 at 204605. The final EA determined that the combined impact of the LRPC and TDM facilities will reduce water flow into the Salton Sea by 0.79 percent and increase the salinity of the Salton Sea by 0.142 percent. DOE–101 at 204431–32. At the same time, the final EA implies that the operation of the plants will reduce the level of biological contaminants in the New River (which ultimately flows into the Salton Sea). *Id.* at 204432. The FONSI concludes that the negative impacts are "minimal and below the threshold of detection of most measuring instruments." DOE–103 at 204605.

Plaintiff argues that the agencies' conclusion is conclusory, not supported by data or analysis, and is due no deference. (*See* Pla's Mem. at 13). In support of its argument, plaintiff points to a document in the record stating that the Salton Sea is already a damaged resource because of too much salinity and that recovery efforts are underway to reduce the level of salinity. DOE–25 at 200943–949. The record also links efforts to control salinity in the Salton Sea to the survival of the region's biodiversity. *See id.* at 200959. Given this evidence of potential impact, plaintiff challenges the agencies' conclusion that an increase in the salinity of the Salton Sea would be insignificant merely because it might be too small to measure.

Defendants respond that they have provided adequate support for their conclusion that the impact will be insignificant because the estimated decrease to inflow and increase in salinity are within the natural range of variability of the Salton Sea and because the operation of the power plants will reduce biological and chemical contaminants in the water. *See* DOE–101 at 204432; (Defs' Mem. & Opp'n at 17 (citing DOE–25 at 201228)).[18] Furthermore, defendants point to the fact that the

---

18. Water used in the power facilities and then returned to the New River will be treated to remove biological and chemical contaminants prior to the use of the water in the plants' cooling processes. *See* DOE–101 at 204431.

construction of evaporation ponds in the effort to restore the Salton Sea to a less degraded state will evaporate more water than the TDM and LRPC facilities will use on an annual basis. (*See* Defs' Mem. & Opp'n at 17 (citing DOE–25 at 200947, 200949)). Therefore, defendants argue that the proposed actions are consistent with the restoration effort. (*Id.*).

■ The Court agrees with plaintiff that the agencies' determination that the actions will not significantly impact the Salton Sea are arbitrary and capricious. First, while decreases in water flow and increases in salinity in the Sea may be "immeasurable," as the EA itself demonstrates, they are not incalculable. In fact, the record makes clear that the actions will increase the salinity of the Sea, that the Sea is under threat from increasing salinity already, and that extensive restoration efforts are underway to reduce the current salinity of the Sea.[19] Given this backdrop, the Court finds it unconvincing to say that merely because measuring in-

struments may not be able to detect an increase in salinity that is bound to occur makes that increase insignificant. The significance of an impact under NEPA has less to do with its measurability and everything to do with the context of the impact. Here, the impacts would affect an "ecologically critical area." *See* 40 C.F.R. § 1508.27(b)(3). It is clear from the record that this resource is currently threatened in a way that will only be exacerbated if the proposed actions are undertaken. To state simply, as the agencies have done, that these known impacts will be hard to measure, that they are within a range of natural variability,[20] or that an unrelated restoration effort will evaporate even more water in its effort to *decrease* salinity in the Sea,[21] is not enough to demonstrate that the impacts will be insignificant. Because the agencies' analysis is not well-reasoned or convincing, the Court finds that they have failed to take the hard look at the impacts of the actions on the Salton Sea required of them under NEPA.[22]

19. This analysis assumes that removing the impacts of the unconnected EAX turbines in the LRPC simply makes the increases in salinity and decreases in water flow proportionally smaller. In any case, the impacts from all the turbines, including those owned by EAX, on the Sea would have to be taken into account in the cumulative impact analysis.

20. This reason in particular makes no sense. The natural variability of water flow and salinity in the Sea has no connection to the projects at issue here. If the projects increase salinity in the Sea, it appears as though this increase will be in addition to, and completely independent of, any natural increase in salinity. Thus, the impact of these projects might be thought of as simply moving the range of natural variability in the direction of increased threat. (*See* Pla's Reply & Opp'n at 12). Such a move does not argue against the significance of the impact, but rather argues strongly in favor of its significance.

21. Defendants pointed out at oral argument that restoration efforts underway in the Salton Sea actually work in a cumulative sense

to ameliorate the impact of increased salinity from the power plants. However, this argument overlooks another major factor in the cumulative impact analysis: the current baseline level of salinity, which is already threatening the area's biodiversity. When the baseline level of salinity is so high that it requires an extensive restoration effort, it is difficult to see how a new source of increased salinity, even a small one, can be insignificant cumulatively. Although the ultimate determination concerning significance is for the agencies and not the Court to make, as discussed in the cumulative impact discussion below, the EA is inadequate as a matter of law because it provides no analysis of the purportedly insignificant increases in salinity from the plants in the context of the high base-line level of salinity.

22. Although it appears that the treatment of water to be used in the plants will remove contaminants in the water and improve the biological and chemical quality of the New River, these welcome benefits do not in some way negate the agencies' duty to separately

#### 4. Controversial Nature of the Impacts

 Plaintiff next argues that the controversy surrounding the potential impacts mandated the preparation of an EIS. (*See* Pla's Mem. at 14–15). " 'Controversy' sufficient to require preparation of an EIS occurs 'when substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor, or there is a substantial dispute [about] the size, nature, or effect of the major Federal action.' " *Public Citizen,* 316 F.3d 1002, 1027 (citing *Nat'l Parks,* 241 F.3d at 736). The evidence establishing such a controversy must be brought to the agency's attention before it completes its deliberations on the proposed action. *Id.* The *Public Citizen* court set out a two-step test for determining the existence of a controversy. First, "[plaintiffs] must show that there was a 'substantial dispute' about [an agency's] actions and that this dispute raised 'substantial questions' about their validity." *Id.* If plaintiff makes this showing, "the burden then shifts to [the agency] to provide a 'convincing' explanation why no controversy exists." *Id.* (citing *Nat'l Parks,* 241 F.3d at 736).

*Public Citizen* held that an "outpouring of public protest" constituted a substantial dispute where 85 percent and 90 percent of public comments opposed the proposed action. *See* 316 F.3d at 1027. Where those comments had merit and the agency "failed to adequately account for its failure to act on them," the court held that the action was "controversial" and required preparation of an EIS. *Id.*

 In the present case, DOE received twelve comment letters before the close of the public comment period, and an additional 400 comments by e-mail after the close of the period. DOE–103 at 204601–204602. Plaintiff cites to concerns raised in all but four of these comment letters concerning the water and air impacts of the power plants. *See* DOE–103 at 204602 (e-mail comment letters raised air and water impacts); DOE–101 at 204442–204443; DOE–72 at 203697, 203699 (air impacts); DOE–79 at 203713–714 (air impacts); DOE–80 at 203717–203719 (air and water impacts); DOE–85 at 203768–769 (water impacts); DOE–82 at 203724–765 (air and water impacts); DOE–86 at 203771 (air and water impacts); DOE–87 at 203773 (air impacts); DOE–71 at 203686 (air impacts). Thus, approximately 67 percent of pre-closure comments and approximately 99 percent of both pre- and post-closure comments raised air and water impact concerns. Plaintiff argues that these comments evidence a "substantial scientific controversy" over the significance of the actions. (Pla's Mem. at 15). Plaintiff additionally argues that the agencies failed to address in the EA or the FONSI whether the comments raise a controversy such that an EIS would be required. (*Id.*).

Defendants point out that public controversy sufficient to require the preparation of an EIS must raise "substantial" questions concerning the significance of any impacts of the proposed action or "substantial" dispute over the size, nature, or effect of the action. *See National Parks,* 241 F.3d at 736. If plaintiff raises such a substantial question or dispute before the preparation of a FONSI, then the burden shifts to the government to provide a "well-reasoned explanation" why the dispute over the EA does not create "a public controversy based on potential environmental consequences." *Id.* (internal quotations omitted).

analyze the negative impacts on water flow and salinity. *See* 40 C.F.R. 1508.27(b)(1) ("Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.").

In the present case, the agency received 412 comments on the proposed actions before the preparation of the FONSIs, although 400 of these comments were received after the close of the comment period. The agencies responded to all 412 comments in the final EA. Although *post hoc* arguments do not suffice to create public controversies and at least one court has found that comments creating a controversy must be made contemporaneously with the comment period, *Nat'l Parks*, 241 F.3d at 737 n. 16, the agencies' consideration of the e-mail comments in the final decision document suggests that the Court should give them some weight. Nearly all of the comments disputed the effects of the action and the significance of those effects. In particular, the comments, considered as a whole, disputed the air and water impacts of the actions and asserted that the generation of the power to be transmitted over the lines were effects of the actions. In light of these comments, the Court finds that plaintiff has demonstrated the existence of a substantial dispute as to the effects and significance of those effects prior to the preparation of the FONSI.

 Defendants argue that even if the comments raised a substantial dispute, the dispute was adequately addressed by responses to the comment letters. (*See* Defs' Mem. & Opp'n at 26). The applicable standard is whether defendants' responses provide a convincing explanation of why the comments do not suffice to constitute a public controversy. *Nat'l Parks*, 241 F.3d at 736; *see also Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir.1997) (holding that where agency

cooperated with objecting parties, and alleviated most of those parties concerns, agency need not prepare EIS). Defendants addressed the comments in a separate section of the EA that compiles them by category. *See* DOE–101 at 204442–48. The Court has reviewed these responses and finds that they generally restate the substance of the comments and then reject those comments to the extent they assert significant air impacts, request mitigating conditions, or challenge the scope of the review. *See id.* The agency did address the comments asserting water impacts by adding a new section into the EA. *Id.* at 204446–47. Nowhere in the discussion of the comments, however, does the agency directly explain, much less "convincingly" explain, why the comments do not suffice to constitute a public controversy. *See LaFlamme v. F.E.R.C.*, 852 F.2d at 401 ("While FERC disputes LaFlamme's contentions, nowhere does FERC explain why LaFlamme's points do not suffice to create a public controversy based on potential environmental consequences. NEPA requires such a well-reasoned explanation.") (brackets and internal quotation omitted). Because a controversy necessarily involves disagreement, it is not enough for defendants to simply point to their disagreement with the comments. Instead, the Court reads the applicable law to place on the agencies the burden of demonstrating the absence of a substantial public disagreement when they choose not to prepare an EIS.[23] Because defendants have failed to make such a showing in the EA or the FONSI, the Court finds that the EA inadequately considered whether the substantial questions raised by the 412 comment letters made the proposed actions

---

**23.** As noted above, defendants did address the water-related comments by expanding the scope of the analysis. *See* DOE–101 at 204446. To the extent this may have eliminated the controversy over these impacts, however, substantial dispute over the scope of the analysis, the need for conditioning the permits on mitigating measures, and the significance of air impacts still existed.

controversial for purposes of determining the potential significance of the actions.

### 5. Local Air Laws

 Finally, plaintiff argues that an EIS must be prepared because the proposed actions threaten to violate local air quality laws. (*See* Pla's Mem. at 17–18). "In its determination of whether its proposed action is significant, an agency must consider '[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.'" *Public Citizen,* 316 F.3d at 1026 (citing 40 C.F.R. § 1508.27(b)(10)). An agency has an obligation under NEPA to consider whether an action might violate state or local rules. *Id.*

Plaintiff's particular argument in the present case is that the proposed action threatens to violate Rule 207 of the Imperial County Air Pollution Control District (ICAPCD), which prohibits net increases from a new stationary source that has the potential to emit 137 pounds per day or more of any non-attainment pollutant. (Pla's Mem. at 17–18). The TDM plant alone is expected to emit 216 tons per year, or 1,184 pounds per day, of PM–10, a nonattainment pollutant in Imperial County. *See* DOE–101 at 204401.

Defendants respond that the plants cannot threaten to violate Imperial County's air laws because the plants are not part of the proposed action and because they are not subject to those laws. (*See* Defs' Mem. & Opp'n at 31–33). With regard to the first part of defendants' argument, the Court has already determined that the TDM and EBC turbines are effects of the proposed action and therefore fall within the scope of the analysis. However, the question of whether the plants are required to be included within an environ-

mental analysis under NEPA differs substantially from the question of whether the plants must meet local air pollution laws. The ICAPCD rule cited by plaintiff applies to "new Stationary Sources ... which are subject to Air Pollution Control District permit requirements." (Ex. 1 to Cty of Imperial's Request for Judicial Notice at Pg. 1).[24] Nothing in the record suggests that the TDM and EBC turbines are subject to the ICAPCD permitting requirements. In fact, defendants contend that these plants are not subject to ICAPCD jurisdiction. *See* DOE–101 at 204328. Plaintiff does not specifically raise any other state or local law that they claim the plants threaten to violate. Accordingly, the Court declines to find that the potential impacts from the actions are significant because they threaten violations of any state or local air pollution laws.

### VI. Is the EA adequate as a matter of law?

#### A. Analysis of Impacts

Plaintiff argues that the EA is deficient because it failed to consider, analyze, and disclose all of the potentially significant impacts of the proposed action. (*See* Pla's Mem. at 22–24). Plaintiff argues that this contravenes one of the fundamental purposes of NEPA, namely, to guarantee "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In particular, plaintiff argues that the EA underestimates potential emissions from the TDM plant, fails to evaluate carbon dioxide and ammonia, and fails to evaluate health impacts of the emissions it does disclose. (*See* Pla's Mem. at 23–24).

---

**24.** The Court considers this extra-record document only for the permissible reason of as-

certaining whether the agencies considered all relevant factors in their EA.

■ First, plaintiff argues that the EA is inadequate because it assumes the TDM plant will produce only 600 megawatts (MW) of energy, even though T–US states in its permit application that it intends its transmission line to be able to carry a maximum potential load of 1400 MW. *See* DOE–36 at 202196; DOE–35 at 202188; DOE–101 at 204401. Furthermore, plaintiff argues that since the Presidential Permit carries no contrary condition on emissions, any expansion in the production capacity of the TDM plant could more than double the analyzed emissions from the plant without requiring any new permit for the transmission. (*See* Pla's Mem. at 23).

■ Defendants respond that they have simply used in their analysis the estimated amount of power to be generated submitted by TDM to the Mexican government in order to secure a license to operate the plant. (*See* Defs' Mem. & Opp'n at 13 (citing DOE–36 at 202201)). Defendants argue that it is not "reasonably foreseeable" that the T–US line will carry more than the assumed 600 MW of power even though T–US stated in its permit application that the line would carry "a nominal 500 MW of power (approximately 700 MW maximum peak) into the U.S., with the potential for an ultimate nominal 1000 MW (with an approximate 1400 MW peak) of power using a possible future, second circuit." (*Id.*) [25] In general, defendants argue that TDM has not "indicated it has any plans to expand the TDM facility." (*Id.*); *but see* DOE–36 at 202201 (stating that a second circuit on the transmission line could "accommodate possible future expansion capability, generated by TDM" to the U.S.). The agencies determined that the "operating characteristics of the facilities" produced the estimate of generation capacity and that the higher assumptions urged by commenters were "undocumented." DOE–101 at 204446. To the extent that the higher emissions urged by plaintiff might be attributable to facilities other than TDM or LRPC, defendants argue that those other facilities are not within the scope of the analysis. (*Id.*). Therefore, defendants contend they are not required under NEPA to speculate about a future expansion of the TDM plant or the use of the lines to transmit power from other facilities. (*Id.* at 14).

The Court finds that the agencies provided adequate support for their conclusion that any future expansion of the TDM plant was not reasonably foreseeable. Plaintiff has pointed to nothing in the record suggesting that such an expansion is anything more than a speculative possibility, dependant on the market for electricity and other factors beyond the scope of this

**25.** Amicus T–US filed a supplemental declaration of Octavio M.C. Simoes in support of a request for judicial notice of the Mexican environmental permits issued to TDM authorizing both the generation and export of power from the TDM plant. These are evidently the same permits that the agencies indirectly relied upon in making their assumption that the TDM plant would generate 600 MW of power. Plaintiff moved to strike the supplemental declaration and request for judicial notice. At oral argument, plaintiff notified that Court that plaintiff and defendants had stipulated to the authenticity of the Mexican permits submitted by T–U.S. Defendants then moved at oral argument to supplement the administrative record by adding the permits. Plaintiff objected on the basis that plaintiff would be prejudiced since it had not had a prior opportunity to examine the documents. The Court finds that although the permits would have been properly made a part of the administrative record in this case, the prejudice to plaintiff of making them a part of the record at this late date outweighs the interest in supplementing the record. Accordingly, the Court denies defendants' motion to supplement the record. For the same reasons, the Court grants plaintiff's motion to strike the supplemental declaration and request for judicial notice.

case. Additionally, defendants' counsel represented at oral argument that any future expansion of the facility to provide export power would require a supplement to the EA because the Presidential Permit currently approves of only the transmission of 600 MW of power. To the extent the potential carrying capacity of the T–US transmission line will be used to carry power from plants other than the TDM plant, the agencies have also demonstrated that the record provides nothing to show that the specific operating details of these plants are reasonably foreseeable, or that these plants would be "effects" for NEPA purposes of the T–US transmission line.[26] In short, the potential for future power generation is simply too remote and speculative to provide a basis for meaningful environmental analysis at the present time.

■■■ Second, plaintiff argues that the EA fails to consider emissions of carbon dioxide and ammonia. Because carbon dioxide contributes to global warming, and because ammonia is known to have health impacts, plaintiff contends that the failure to assess and disclose the impacts makes the EA inadequate. (*See* Pla's Mem. at 23–24). Defendants respond that nothing in the record provides a basis for the assertion that the agencies should have considered ammonia and carbon dioxide emissions. (*See* Defs' Mem. & Opp'n at 15). Additionally, defendants assert that neither ammonia nor carbon dioxide is a hazardous or toxic pollutant under federal or California law. (*Id.*). Accordingly, defendants argue that they were not arbitrary and capricious in not analyzing these effects. (*Id.*).

Although the federal defendants cite authority for the proposition that they need not evaluate "questionable effects" or "imaginary horribles," these cases are inapposite to the question posed by the emissions described here. (*Id.*). Defendants do not dispute that the TDM and EBC turbines will emit ammonia and carbon dioxide; these effects are neither questionable nor imaginary. Additionally, the record reflects that ammonia may cause acute and chronic health impacts. *See* DOE–23 at 200819. Although the agencies state that plaintiff has provided no authority for the proposition that it must consider the impacts of carbon dioxide and ammonia, neither do the agencies provide reasoning or legal authority for their proposition that they need not disclose and analyze these emissions merely because the EPA has not designated them as "criteria pollutants." (*See* Defs' Mem. & Opp'n at 14–15). In fact, one of defendants' consultants advised the agencies that "all criteria and non-criterion air pollutants relevant to the proposed action should be assessed." DOE–55 at 202850.

The record shows that carbon dioxide is one of the pollutants emitted by a natural gas turbine and that it is a greenhouse gas.[27] *See* DOE–17 at 200640; DOE–15 at

---

**26.** For example, to conduct any legitimate analysis of the environmental impact of the additional generation of power to be carried by the T–US line, the agencies would have to be able to reasonably foresee the location of the additional power plants and their method of generation. The record does not suggest any of this information, nor does plaintiff in its brief.

**27.** A "greenhouse" gas is one that is "of, relating to, contributing to, or caused by the greenhouse effect." *See Merriam–Webster* *Dictionary,* on-line edition (available at *www.m-w.com* ) (last visited April 24, 2003). A "greenhouse effect" is the "warming of the surface and lower atmosphere of a planet ... that is caused by conversion of solar radiation into heat in a process involving selective transmission of short wave solar radiation by the atmosphere, its absorption by the planet's surface, and reradiation as infrared which is absorbed and partly reradiated back to the surface by atmospheric gases." *Id.*

200386. Additionally, plaintiff argues that carbon dioxide emissions are the greatest by weight of all pollutants emitted by natural gas turbines, and charts from the record appear to support that argument. *See* DOE–17 at 200646–47. Similarly, the record discloses that ammonia is a by-product of the control technology used in the EBC and TDM turbines and that it causes acute and chronic health effects. *See* DOE–23 at 200818–19. Because these emissions have potential environmental impacts and were indicated by the record, the Court finds that the EA's failure to disclose and analyze their significance is counter to NEPA.

Finally, plaintiff argues that the EA is inadequate because it fails to evaluate health impacts related to the CO, NOx, and PM–10 emissions of the plants. The Court finds that the agencies' evaluation of health impacts was adequate based on the discussion in Section V.B.1, above.

### B. *Alternatives*

▮▮▮▮▮ Plaintiff argues next that the EA was inadequate because it failed to present reasonable and feasible alternatives. NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Agencies must consider alternatives in an EA. *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir.1988); 40 C.F.R. § 1508.9(b). The alternatives analysis is central to an environmental analysis. 40 C.F.R. § 1502.14. It should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a

clear basis for choice among options by the decisionmaker and the public." *Id.* "The rule of reason guides both the choice of alternatives as well as the extent to which the [NEPA analysis] must discuss each alternative." *Public Citizen,* 316 F.3d at 1028 (internal citations and quotations omitted).

In the present case, plaintiff argues that the agencies were required under NEPA to do more than consider only a "no action" alternative and two alternative locations for the transmission lines. *See* DOE–101 at 204328, 204352–204354.[28] In particular, plaintiff argues that the agencies should have considered the proposal put forward by plaintiff in its comments; namely, that the granting of the rights-of-way and the Presidential Permits be conditioned on the commitment of the project proponents to implementation of state-of-the-art emissions control systems, mitigation through offsets in existing sources, and the use of dry cooling or parallel dry-wet cooling. DOE–82 at 203725–203727. Two other commentators suggested conditioning the issuance of the permits on certain controls for air and water emissions. *See* DOE–79 at 203714–203715 (comments of the American Lung Association) and DOE–80 at 203718–203719 (comments of Congressman Filner requesting a delay until mitigation measures could be adopted). Plaintiff argues that conditioning the permits in such a way was both within DOE's authority and feasible. (Pla's Mem. at 20–21). In sum, plaintiff argues that the agencies did not find that the alternatives proposed were unreasonable, but rather that the agencies simply never evaluated them. (*Id.* at 22).

In response, defendants argue that conditioning the Presidential Permits at issue

---

**28.** In fact, defendants also considered the alternative of granting only one permit and not the other. *See* DOE–101 at 204328–30.

would have been beyond the scope of the "purpose and need" of the proposed actions, since those actions dealt only with the construction and operation of the transmission lines and not with the operation of the power plants. (*See* Defs' Mem. & Opp'n at 18). In particular, defendants explained at argument their view that the alternatives analysis is co-extensive with the scope of the proposed action, and that it does not extend to the full scope of the review required under NEPA. Thus, defendants apparently contend that they only need consider alternatives to the direct effects of the construction of the power lines (e.g., the localized effects from construction of the towers).

 The agencies need only consider alternatives that are feasible, and the analysis "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man ... regardless of how uncommon or unknown that alternative may have been at the time the project was approved," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Yet, plaintiff and others put forward the alternative of conditioning the permits in their comments responding to the draft EA. Plaintiff also argues that conditioning the permit was feasible since other conditions were placed on the permits. (*See* Pla's Mem. at 20). Additionally, plaintiff cites an Executive Order that grants DOE the authority to place conditions on Presidential Permits necessary to protect the public interest. *See* Executive Order 10485, § 1(a)(3), 18 Fed.Reg. 5397 (Sept. 3, 1953) *as amended by* Executive Order 12038 § 2(A), 43 Fed. Reg. 4957 (Feb. 3, 1978). Defendants argue that the "purpose and need" of the federal actions at issue did not include the generation of power at the Mexican plants. However, to the extent that this is simply a restatement of the threshold argument

discussed above, the Court has already resolved that question by finding that the TDM facility and the EBC turbine are effects of the action. Said in another way, the purpose and need of the transmission lines is to deliver power from the TDM and EBC turbines.

 Additionally, to the extent defendants argue that they need only consider alternatives narrowly related to the scope of the proposed action rather than considering indirect effects of the action, the Court holds otherwise. "[A]n agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir.1992) (internal quotation omitted). Here, the scope of the action relates only to the transmission lines, but the nature of the action includes the full scope of the analysis, including the effects of the action. The nature of the action therefore includes the importation of power generated in Mexico. Indeed, to leave out the secondary impacts would be at odds with the purpose of the alternatives analysis, which is to provide a way for an agency to calculate and compare the various predicted effects of alternative courses of action. The analysis would be arbitrary in itself if it did not take into account all effects of a proposed action. Accordingly, defendants' argument that they need not consider alternatives related to the TDM and EBC facilities fails.

 Given this nature, the agencies were obligated to set forth in the EA "the range of alternatives ... sufficient to permit a reasoned choice." *Methow Valley Citizens Council*, 833 F.2d at 815. Although defendants argue that "international sensitivities" preclude conditioning the permits from being a reasonable and feasible alternative, such a discussion belongs in the EA's alternative analysis

rather than a litigation brief. Furthermore, the Court is unconvinced that the federal government's conditioning of a permit to construct transmission lines within the government's jurisdiction to ameliorate negative environmental effects within the United States necessarily offends international principles of law.[29] The condition would not be a direct regulation of the Mexican power plants; those plants could still choose to sell their power to the Mexican market or transmit their power via an alternate route rather than meet the condition.

▮ Plaintiff bears the burden of showing that the agency was alerted to the specific alternative at issue before it prepared the EA in question. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021–1022 (9th Cir.1986). This requirement helps ensure that the alternative was not so remote and speculative as to have precluded the agencies from ascertaining the possibility. *See Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir.1973). In the present case, commenters, including plaintiff, clearly proposed withholding the permits until the federal defendants could be certain that the power generation met certain environmental standards. DOE–82 at 203725–203727; DOE–79 at 203714–203715; DOE–80 at 203718–203719. Accordingly, the Court is hard-pressed to find that the proposed alternative could not be reasonably ascertained by the agencies during their deliberations. Because the Court finds that the conditioning of the

permits is a reasonable and feasible alternative within the nature of the proposed actions, the Court finds that the analysis of alternatives in the EA was inadequate in this regard.

### C. Cumulative Impact Analysis

▮ Finally, plaintiff argues that the EA is inadequate because it fails to adequately assess the cumulative impacts of the proposed actions. (*See* Pla's Mem. at 24–25). NEPA regulations explain that the cumulative impact of a project consists of the "incremental impact of the action when added to other past, present, and reasonably foreseeable future action regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *See Sylvester*, 884 F.2d at 400 (citing 40 C.F.R. § 1508.7).

Although NEPA does not require the government to do the impractical, *Inland Empire Public Lands Council v. United States Forest Service*, 88 F.3d 754, 764 (9th Cir.1996), the Ninth Circuit has held that "reasonably foreseeable" actions with potentially cumulative impacts must be analyzed under NEPA. *Blue Mountains*, 161 F.3d at 1215. *Native Ecosystems Council v. Dombeck* made clear the importance of the cumulative impact analysis:

> The importance of ensuring that EAs consider the additive effect of many incremental environmental encroachments is clear. "[I]n a typical year, 45,000 EAs are prepared compared to 450

---

**29.** Defendants argue in the same breath that conditions are not necessary on the permits because of the voluntary measures undertaken by the power plants. Defendants seem to argue that if these voluntary measures were dropped in the future, defendants could then conduct a supplementary environmental analysis that would presumptively lead to a condition on the permit. (*See* Defs' Mem. & Opp'n at 22–23, n. 14). The Court is at a loss to understand why such conditions might not

raise international sensitivities in the future after voluntary agreements failed, when the same conditions are not even feasible enough to be considered in an EA today. In the same vein, the Court fails to see how denying one or both of the permits because of U.S. environmental impacts—alternatives considered by the EA (*See* Defs' Mem. & Opp'n at 24)—would have any less of an effect on international sensitivities than the conditioning of the permits.

EISs.... Given that so many more EAs are prepared than EISs, *adequate consideration of cumulative effects requires that EAs address them fully.*" *Kern [v. U.S. Bureau of Land Management]*, 284 F.3d [1062] at 1076 [9th Cir.2002] (emphasis in original) (quoting Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* at 4, January 1997). As we have previously emphasized when considering the sufficiency of a timber sale EA, without a consideration of individually minor but cumulatively significant effects "it would be easy to underestimate the cumulative impacts of the timber sales ..., and of other reasonably foreseeable future actions, on the [environment]." *Id.* at 1078.

304 F.3d 886, 896 (9th Cir.2002) (bracketed citation information added).

Plaintiff argues that the EA contains no cumulative impact analysis for effects on health, water quality or quantity, the Salton Sea, or ozone. (Pla's Mem. at 16). Additionally, plaintiff argues that the cumulative air impact analysis in the EA is inadequate to support the conclusion that the impact is insignificant. (*Id.*). In particular, plaintiff points to statements by DOE's consultant advising DOE that the air impacts of the power plants when considered in conjunction with the current non-attainment status of Imperial County's airshed might be cumulatively significant. *See* DOE–55 at 202850–202851. Additionally, plaintiff points to agency comments that the cumulative impacts section of the EA lacked discussion of potentially significant impacts. *See* P–52 at 102697 ("It would seem that the incremental addition of NOx to an ozone non-attainment area is exactly the kind of impact that discussions of cumulative impacts are intended to address.").

The cumulative impacts section of the EA analyzed the NOx, CO, and PM–10 impacts not only from the TDM and EBC turbines that are effects of the action, but also the remaining LRPC turbines. (*See* Def's Mem. & Opp'n at 34 (citing DOE–101 at 204438)). That analysis determined that the projected increases in ambient concentrations of those pollutants will be below the significance levels established by the EPA. (*Id.*). However, the cumulative impacts section of the EA fails to expressly disclose the past or present levels of air emissions in the Salton Sea Air Basin, nor does it consider the combined effects of the present actions when added to any unrelated, reasonably foreseeable future electricity generation projects in the air basin. *See* DOE–101 at 204436–40 (lacking discussion of these cumulative impacts). Although the federal defendants argue that no other emissions are foreseeable, plaintiffs point to information in the record suggesting plans for the construction of three additional power plants in the region. (*See* Pla's Reply & Opp'n at 18 (citing DOE–71 at 203687, DOE–79 at 203714)). Additionally, plaintiff argues that at least the potential expansion of the TDM plant to a maximum capacity of 1400 MW should have been considered. (*Id.*).

Defendants argue that additional power plant projects in the project area are "rumors" that the agencies do not consider to be concrete enough to be reasonably foreseeable. DOE–101 at 204438. Without more, the Court is unable to uphold its responsibility of determining whether the agencies took a hard look at potential cumulative impacts arising from other power plants in the area. The EA fails to list the plants expressly noted by the Imperial County Air Pollution Control District and the American Lung Association in their comment letters, and furthermore fails to

support in any way the conclusion that the emissions from these plants are not reasonably foreseeable. *See* DOE–71 at 203687; DOE–79 at 203714. In contrast, and as discussed more in section VI(A) above, the agencies considered and provided support to reject the assertion that the future expansion of the TDM to produce a maximum 1400 MW was reasonably foreseeable.

Furthermore, defendants argue that since all impacts of the LRPC and the TDM plant were measured together and found not to rise above the SLs at the U.S. border, the combined impact of these turbines will not significantly impact the present background levels of the measured pollutants in Imperial County. *Id.* The Court agrees with the federal defendants that the cumulative impact analysis necessarily considers the impact of the cumulative LRPC and TDM emissions when combined with the current air quality of the Salton Sea Air Basin. Indeed, the agencies' finding that the emissions would not exceed the SLs means that the concentration of these air pollutants in Imperial County would not be significantly impacted by the operation of the plants. Accordingly, the Court finds that the EA adequately considered the cumulative impact of the TDM and LRPC emissions against the background of Imperial County's present air quality.

Finally, a review of the cumulative impact section of the EA and the entire FONSI fails to disclose any discussion of the actions' cumulative impact on water quality and quantity in the New River or the Salton Sea. The complete lack of an analysis of cumulative water impacts is inherently inadequate. In sum, the Court finds that the cumulative impact analysis in the EA is inadequate because the analysis fails to consider the combined impacts of future, specific power plants in the region and the cumulative impact on water resources.

## VII. CONCLUSION

Based on the discussion above, the Court **GRANTS IN PART** plaintiff's motion for summary judgment to the extent it asserts violations of NEPA and the APA arising from the EA and FONSI's inadequate analysis of the following issues: (1) **the potential for controversy; (2) water impacts; (3) impacts from ammonia and carbon dioxide; (4) alternatives; and (5) cumulative impacts.** The Court **DENIES IN PART** defendants' motion for summary judgment as to the same issues. However, the Court **GRANTS IN PART** defendants' motion for summary judgment as to the remaining issues raised by plaintiffs, and **DENIES IN PART** plaintiff's motion as to those issues.

Additionally, the Court **DENIES** defendants' motion to strike plaintiff's extra-record declarations, **DENIES** defendants' motion to supplement the record, and **GRANTS** plaintiff's motion to strike T–US's supplemental declaration and request for judicial notice. Accordingly, the Court **STRIKES** T–US's supplemental declaration and request for judicial notice from the record.

Finally, the Court **INVITES** the parties, including defendant-intervenors T–US and BCP, to provide briefing on the question of an appropriate remedy or remedies for the violations found above. The parties shall provide briefing, if any, according to the following schedule and limitations:

| BRIEF | TO BE FILED AND SERVED ON OTHER PARTIES ON OR BEFORE: | PAGE LIMITATION |
| --- | --- | --- |
| Plaintiff's Memorandum on Remedies | May 19, 2003 | 10 |
| Federal Defendants' Opposition | June 2, 2003 | 10 |
| Defendant–Intervenor T–US's Opposition | June 2, 2003 | 10 |
| Defendant–Intervenor BCP's Opposition | June 2, 2003 | 10 |
| Plaintiff's Reply | June 9, 2003 | 10 |

The Court will hear argument concerning the appropriate remedy on June 16, 2003, at 10:30 a.m. in Courtroom 13, unless the Court notifies the parties otherwise.

**IT IS SO ORDERED.**